Crock, Appellant, v. Crock.

378

Argued April 24, 1929.

Before TREXLER, KELLER, GAWTHROP, CUNNINGHAM and BALDRIGE, JJ.

*Joseph I. Winslow,* and with him *Ralfe O. P. Silverman,* for appellant.

*Horton Smith,* for appellee.

OPINION BY GAWTHROP, J., July 2, 1929:

We are asked to review the action of the court below in refusing a divorce to the husband, sought on the grounds of cruel and barbarous treatment and indignities to the person. We have carefully considered all of the testimony, which is voluminous. The complaint is supported largely by the testimony of libellant and his daughter by a former marriage who is now sixteen years of age. The parties were married April 14, 1920, and lived together until March, 1927. They have no children. The testimony of libellant is to the effect

that on the wedding trip, when they arrived at Canton, he refused to hire a cab and required his wife to walk to the hotel; that when they reached their room, the wife threw herself across the bed and screamed and cried and said that she wanted to go home; that he rented a house at 319 Comrie Street, Braddock, Pennsylvania, where they lived about five months; that the wife objected to the husband's helping his child with her school work; that "she would scream and yell" when he did it; that she objected to his reading the newspaper, stating "there is nothing but scandal in the paper and you have no right to read the paper because your time is mine;" that she objected to his going to the cemetery to visit the grave of his former wife; that about September 30, 1920, they moved to 7417 Race Street, Pittsburgh, where they lived until July 31, 1922; that when he arrived home on a certain evening, he noticed that his daughter's lip was swollen and when he asked her what was wrong she said "mother struck me;" that the wife "yelled and screamed" and said "I did it and will do it again," and that she suggested that the daughter be placed in a reform school; that on a certain evening the wife asked him to beat a carpet and threatened to "beat him if he didn't beat it;" that on several occasions she threw dishes at him and his daughter and scolded them, beat the daughter with a stick and pulled her hair, and that he had to give in to her to have peace at home; that she swore at him, used the word "damn" and told him "to go to hell;" that on one occasion when it was necessary for him to attend a meeting in the evening, the wife told him that she was going out herself and "I did not marry you to keep your kid," and he had to stay at home; that on one occasion she told him that a certain man had called her on the telephone more than fifty times, trying to make a date

with her; that on an occasion when there was a party in the house of his sister across the street and the guests were singing and playing on the piano, his wife raised the window and called, "if you don't want to sleep we do;" that on one occasion she drank so much wine that she became drunk; that she called her husband "Crock" in the presence of others and referred to him as her "washwoman;" that on one occasion, when he asked her to cease yelling at her stepdaughter, she struck him in the face and broke his eye glasses and cut his eye-lid; that she told his mother that if the latter "had more brains, maybe I would have a little more and she would not have as much trouble training me;" that on one occasion at the dinner table she stated to her friends in his presence that he had gone out with another woman and made a date with her and kept it; that once she threw her engagement ring at him; that she told him that "she could hardly pass the bathroom cupboard without taking iodine. She could hardly do it because, she said, that in case she did commit suicide the neighbors would blame me for it, and that if it would not be for casting her soul into hell she would go down and jump into the river;" that while sitting at the table one evening when everything was quiet, Mrs. Crock said to the daughter, "did you shave your eyebrows," and that when the daughter answered, "what if I did," Mrs. Crock hit her in the face with her fist and then got the broom stick and was going to beat her over the head when he interfered; she then screamed and said, "I will murder both of you, if I know I will hang tomorrow;" that on January 14, 1927, the husband did the family ironing; before he had finished it the daughter came to him and said, "can I help you?" When she had ironed a bed sheet Mrs. Crock examined it and complained

that the sheet had a wrinkle in it and said, "this is the way your daughter does the work after I train her" and started to scream. He sent the daughter to her bedroom. Mrs. Crock followed her to her bedroom. When the husband started to go up the stairway, Mrs. Crock came to the top of the steps with a hand mirror in her hand and said, "if you come up one step I will murder her." As he was passing up the steps she threw the mirror at him. When he got to the daughter's room, the wife was striking the daughter on the head. When he restrained her she yelled and swore. He thus describes what followed: "I was helping her along, getting her in our bedroom. I led her to the bed and she grabbed a statue and started to beat me and in the shuffle she broke it and then she took off her shoe and started to beat me with it, and when I took the shoe off her and held her hands to try to get her to desist, she started to bite my hand. She swore continually. Q. How long did you have to hold her? A. I held her for an hour until she quieted down, and then I went to the bathroom and removed the iodine from there to the first floor, but I watched over her until about midnight and then I slept very little the rest of the night. Q. Was that the last incident, in the treatment of each other, before the separation? A. That was January 4th of this year."

The testimony of the husband, as to many of the instances above described, is corroborated by that of his daughter. His other witnesses did not substantially strengthen his case. The wife's testimony is in sharp conflict with his. She denied or explained all of the more serious charges above described, although she admitted that she corrected the daughter when she deemed it necessary and sometimes administered corporal punishment to her, but denied that it was more than was ordinary and proper. Her neighbors testi-

fied that she had a well ordered house and that the parties apparently lived together amicably. It is an admitted fact that she has been suffering from diabetes since 1922, and that as a result of this disease she was treated in a hospital on at least three occasions. Dr. Utley, libellant's family physician who was called by him as a witness, testified that libellant consulted him about his wife's condition on two or three occasions, described the conditions at home and appeared to be anxious to do what was best for her. He testified: "When Mrs. Crock was sugar free, that is the diabetes improved, she seemed to be reasonably well mentally and not so nervous. When there was a large amount of sugar in the urine and the blood sugar was abnormally high, she was nervous," and that this nervous condition would manifest itself in irregular acts, or irritability; that in January, 1927, he could think of no other course to pursue than to have her placed in a hospital for observation to determine whether the nervousness was caused by the diabetes, or other conditions; that she was at that time placed in the St. Francis Hospital under Dr. Henninger, a neurologist. Dr. Henninger testified that when she was under his care at that hospital from January 9, 1927, to January 13, 1927, she was suffering with hysteria and "had a very marked emotional disturbance." Dr. Utley testified that while the respondent was in the St. Francis Hospital on this occasion the libellant asked him: "What shall I do? Seek a divorce or separation?" and that he replied, "apparently that is the only course left for you." This conversation occurred some weeks after the respondent had been taken to the hospital. She remained there until March 6, 1927, and they have not since lived together.

Our conclusion from a reading of the evidence is that libellant's proof is not so clear as to warrant a

divorce on either ground set up in the libel. It is undisputed that for a considerable part of her married life respondent was a sick woman. The conduct of which libellant complains seems to have resulted largely from her highly nervous condition which, as he was well aware, was caused by her physical condition. The law does not recognize conduct resulting from such causes as a ground for divorce. The situation of the husband doubtless is, and has been, a most unfortunate one, requiring patience and forbearance, but the law does not recognize this as a ground for divorce. In the granting of a divorce on the ground of cruel and barbarous treatment and indignities to the person, the evidence should be very clear and unambiguous: Forrester v. Forrester, 77 Pa. Superior Ct. 364. The burden was on libellant to establish a case by that measure of proof. We cannot escape the conclusion that appellant has not discharged this burden.

The decree is therefore affirmed at the cost of the appellant.