## Fisher, Appellant, *v.* Fisher.

Argued December 7, 1943. Before BALDRIGE, STADT-FELD, RHODES, HIRT, KENWORTHEY and RENO, JJ. (KELLER, P. J., absent).

*Paul Yermish,* with him *Joseph Ominsky,* for appellant.

No one appeared or filed a brief for appellee.

OPINION BY RENO, J., March 3, 1944:

The wife, appellant, seeks a divorce for cruelty and

indignities. The master recommended a decree for indignities, but before the final rule was issued respondent was committed to the Norristown State Hospital. A committee ad litem was appointed to represent his interests. The respondent never entered an appearance or presented a defense before the master or the court below, but, upon the intervention of members of his family, the court recommitted the case to the master to take further testimony, and a divorce was again recommended. Exceptions to the master's supplemental report were sustained, and the libel was dismissed. This appeal followed, and here appellant abandoned the charge of cruelty.

The parties were married on May 27, 1931, and lived together at various places in Philadelphia until their separation on July 10, 1940. The indignities and cruelty were alleged to have begun soon after the marriage and to have continued up to the separation. Immediately after the separation, respondent underwent institutional treatments for a mental disorder until he was committed to Norristown on October 14, 1940. During the summer of 1941, the respondent was allowed to leave the Norristown institution for periods of one or two days in the custody of his family, and he was paroled in their care on September 5, 1941. The libel was issued on September. 11, 1941; the master's first hearing, at which respondent was not represented, was held on December 18, 1941; and on January 10, 1942, before further proceedings had taken place, respondent was returned to Norristown, where he has remained ever since. He is suffering from chronic dementia praecox.

The mental illness of this respondent has no bearing upon the case. It is true that the insanity of one of the parties to the marriage contract, if it existed at the time of, and was the moving cause for, the conduct relied upon as grounds for a divorce, will prevent the

granting of a decree based on cruelty and indignities: *Benjeski v. Benjeski,* 150 Pa. Superior Ct. 57, 27 A. 2d 266. Where, however, the activities of the offending spouse have been such as to entitle the innocent party to a divorce, the subsequent insanity of the offender is not a bar to a divorce: *Little v. Little,* 56 Pa. Superior Ct. 419. That cruelty or indignities were the product of a mental derangement and hence were not wilful and intentional is an affirmative defense that must be raised and supported by the respondent. The present record is utterly devoid of evidence tending to shed any light upon respondent's mental condition prior to the separation in July, 1940, and hence his illness must be laid entirely out of the case.

The only witnesses were libellant; Katherine Fisher, a second cousin of respondent, who had lived with the parties from 1934 to 1940; and Louis Fisher, another second cousin of respondent, who had visited the couple's home almost daily for about six years beginning in 1931 and who had lived with them for two and one half years beginning in 1937.

Libellant testified that respondent criticized, complained, nagged, grumbled; that he would have a "grouchy disposition" when, upon a late arrival home in the evening, his supper was cold; and that respondent would compare libellant unfavorably with his sister, saying that the sister had better ideas and better taste than did libellant. As a result of this conduct, libellant claimed, she would have crying spells; would be unable to digest her food; and would be unable to sleep. She lost thirty pounds, was "mentally a wreck" and her "nerves were in a bad condition." In the year and a half intervening between the separation and the master's first hearing, libellant regained eight pounds. This testimony was partially corroborated by Katherine Fisher, who said she had seen libellant cry and that she was "nervous and somewhat run down."

Respondent, according to libellant's testimony, would curse at her "pretty often", calling her vile names, sometimes in front of third parties, including the two witnesses. Katherine Fisher stated that she had heard respondent's profanity quite often, but Louis Fisher, who stated that the couple engaged in domestic arguments on occasion, denied that such strong expressions had ever been used in his presence.

The libellant stated, and it was corroborated by Katherine Fisher, that respondent gave her only fifty cents a day with which to maintain her table, although he earned about $35 a week. Respondent was careless about paying bills and at one time a grocer's bill of $40 had accumulated, part of which was paid with money given libellant by her family. Katherine Fisher, however, testified that she had made regular payments for her board while she lived with the parties and that libellant retained the board money and used it for the purchase of food, and libellant admitted on cross-examination that respondent had paid many bills. Although libellant asserted that her family purchased most of her clothes for her after she was married, she further testified that respondent had bought her a fur coat for $250, a vacuum cleaner for $75, had contributed $25 toward a refrigerator given by libellant to her mother as a present, and had been an accommodation endorser on a note in the amount of $100 for libellant's father.

Libellant further claimed that respondent had subjected her to physical abuse on three occasions and that he sometimes pushed her and shoved her "just to be mean." In 1934, respondent struck libellant with his open hand, she testified, in an argument about money; in 1938 he pushed her head against the automobile door, in a fit of anger at her supposed pregnancy; and he again slapped her during the summer of 1939 in an argument over the wedding of some friends. Katherine Fisher testified that she saw respondent raise his arm

as though to strike libellant on one occasion, although no blow followed, and that she had once seen bruises on libellant's face and arm which libellant said had been caused by respondent's blows. This testimony is not persuasive, however, as libellant never claimed that she had been struck on the arm or on any part of her body other than her face.

Libellant also asserted that respondent had sometimes struck their child, Herbert, "for no reason at all", and that the boy would call respondent a "bad man", all of which contributed additionally to libellant's state of nervousness. Katherine Fisher testified that she had seen respondent slap the child for not coming to his father when told to do so.

On cross-examination, libellant admitted that she had no intention of securing a divorce when the parties separated in July, 1940, and she acknowledged having written five letters to respondent during April, May and June, 1941, while he was confined to the Norristown State Hospital. The letters are in a most friendly and affectionate vein, some of them even employing direct language of endearment, conveying the usual family gossip to be expected in communications between persons in the situation in which these parties found themselves. They contain expressions of libellant's hopes for respondent's speedy recovery and plans for the purchase of a farm on which to live in quiet happiness after respondent's discharge from the institution. It is manifest from these letters that libellant, during that period, was completely satisfied with the marriage and, far from finding life a burden, was eagerly anticipating the resumption of conjugal relations with respondent.

The general assertions by libellant of nagging, criticizing, grumbling and grouchiness have no evidentiary force. They are the mere conclusions of the witness, and such general statements are, as was said in *Ford v.*

*Ford,* 67 Pa. Superior Ct. 350, 352: "...... of no value unless accompanied by the actual facts on which these assertions are based. We are entitled in the consideration of the case to have the particulars as to the words spoken or the thing done that constituted the cruel and barbarous treatment which rendered the condition of her husband [libellant] intolerable and life burdensome ...... We can extend no sound judgment in such cases without studying the acts complained of in their connection with the character of the parties." Likewise, libellant's testimony that she was "mentally a wreck" and that her "nerves were in a bad condition", have little or no probative value. There is no medical testimony or direct proof that libellant's infirmities resulted from mistreatment. They may have been produced by any one of many possible causes which operate as well in a felicitous marital atmosphere: *Rose v. Rose,* 124 Pa. Superior Ct. 437, 188 A. 595; *Schulze v. Schulze,* 33 Pa. Superior Ct. 325.

Respondent's profanity, even if used "pretty often", as testified by libellant, "...... is not conclusive of the matter and must not necessarily result in the granting of the divorce. All the circumstances in the case must be considered in order to arrive at a just conclusion:" *Manzi v. Manzi,* 112 Pa. Superior Ct. 332, 333, 171 A. 92. Concerning the three instances when libellant was subjected to minor forms of physical violence, we note that these were spread over a period of nine years and none of them produced any serious or permanent effects on her health or comfort. "But altercations, even if accompanied by slapping or slight blows, incompatibility of temper, or manifestation of temporary irritation, are too petty and trifling to justify the granting of a divorce": *Knox v. Knox,* 109 Pa. Superior Ct. 45, 48, 165 A. 769. "Occasional manifestations of irritable disposition are not sufficient to establish a course of conduct constituting" indignities: *Wallian v. Wallian,* 90

Pa. Superior Ct. 438, 442. See also *Ponthus v. Ponthus,* 66 Pa. Superior Ct. 257.

With respect to the charges that respondent was miserly in providing funds for the purchase of food, it must be observed that libellant did not complain that she was unable to maintain a nourishing table on the funds at her disposal, including the board money regularly paid her by the witness, Katherine Fisher. While mere neglect and non-support do not in themselves constitute indignities (*Headland v. Headland,* 88 Pa. Superior Ct. 417), we cannot even say that respondent was neglectful, considering his economic position and his station in life. Libellant was provided with a fur coat and a vacuum cleaner, and respondent did not refuse aid to libellant's parents when called upon for a contribution toward a refrigerator and an accommodation endorsement.

We do not believe the treatment of the child, Herbert, was sufficiently violent or often enough repeated to be considered as having made intolerable the condition of his mother. Respondent's treatment of the boy may have been necessary in order effectually to inculcate in him traits of obedience and respect; but any conclusion in this regard would be mere speculation, as there is nothing in the record to apprise us of Herbert's disposition and temperament. At any event, respondent was not shown to have grossly and cruelly abused the child without justification. See *Picciano v. Picciano,* 110 Pa. Superior Ct. 189, 168 A. 488.

The whole record leads us to the conclusion that, while the married life of the parties was not at all times harmonious, the discordant interludes were but isolated instances of passing incompatibility. The evidence has not established, by the measure of proof required, a course of conduct manifesting settled hate and estrangement, but, rather, it has developed merely an unrelated series of minor altercations and disagreements,

insufficient under the law to entitle libellant to a decree: *Viney v. Viney,* 151 Pa. Superior Ct. 86, 29 A. 2d 437; *Taylor v. Taylor,* 142 Pa. Superior Ct. 441, 16 A. 2d 651; *Davidsen v. Davidsen,* 127 Pa. Superior Ct. 138, 191 A. 619.

Decree affirmed.