## Glass *v.* Glass, Appellant.

Argued November 16, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Willis A. MacDonald,* for appellant.

*Clyde S. Shumaker,* with him *George P. Kiester,* for appellee.

OPINION BY FINE, J., January 14, 1949:

The libellant filed this action in divorce, alleging desertion and such indignities to the person as to render his condition intolerable and life burdensome. A bill of particulars and answer thereto were filed, and hearings were held before a master who found no desertion but recommended a divorce on the ground of indignities. The report of the master, his findings of fact and conclusions of law were approved and adopted by the court below, and a divorce was granted. Respondent appealed.

We have reviewed the testimony carefully, reading the whole record and scrutinizing the evidence as we are required to do, and we are of the opinion that the facts essential to the right of the husband to a decree in divorce have not been established by clear and satisfactory proofs.

Carl M. Glass, libellant, and Estella E. Y. Glass, respondent, were married on August 20, 1918, and when the libel was filed they were aged forty-six and forty-three years, respectively. Their entire married life was spent in Butler County, Pennsylvania, and to this marriage were born four children, their names and ages at the time of hearing were: Dorothy (Mrs. J. M. Butler), aged twenty-nine; Howard, aged twenty-one; Floyd, aged twenty; and Betty, aged sixteen. The parties have not lived together since respondent's admission into the Torrance State Hospital where she was treated for almost eight months and from which she was released on April 10, 1942. The libellant is district manager of the Socony-Vacuum Company and is a man of more than ordinary abilities. He is ambitious and industrious. He applied himself to community and fraternal affairs with the same ardor until forced to relinquish such activities by his wife's antagonistic attitude. On the whole, his time during most of his married life was occupied by activities and interests which were not only helpful to advancement in his employment but were in aid of the betterment of the community in which they lived.

The libellant testified that since the first Christmas (1918) succeeding their marriage when she spurned his gifts of a fur muff and neck piece, the respondent has manifested a contemptuous disposition toward him. Prior to July, 1925, when the respondent was first hospitalized there were three other alleged acts of indignities, all of which were separated by intervals of approximately two years or more. Since 1925, libellant's testimony is to the effect that she complained and nagged

him with great frequency about his infrequent home-comings at late hours and absences from home; that she was critical of the friends of the libellant so that they ceased their visits to the home; that she possessed a decidedly jealous disposition and entertained suspicions that he was guilty of immorality with different women; that she frequently voiced those suspicions, sometimes in the presence of the children; that she cursed and ridiculed him; that she interfered with his employment by disturbing his sleep during the night and by calling employes of his company, including superior officers, to instill doubt of libellant's character and qualifications. The libellant stated she kept him in a constant state of fear and trepidation, which induced his nervous condition, loss of weight and impairment of health.

The respondent denied the indignities alleged by her husband and strongly intimated that during the last two years they lived together his affections cooled. She admitted that he was a very good provider, a splendid husband and at all times a devoted father. Since the separation, all the children remained with the father until they either married or voluntarily left because of their employment or other engagements.

We are of the opinion, concurring with the master, that the evidence of the libellant is of such integrity and probity that there is no doubt the acts complained of did occur. The corroborative proofs of third parties, especially of their two children, decidedly favored the libellant. We too agree with the libellant that there exists no ground for reconciliation. Furthermore, assuming libellant's relations with Mary Brigamen were more than platonic, nevertheless such relations were subsequent to the commission of the alleged indignities and could not successfully be asserted in defense of the wife's actions. Cf. *Com. ex rel. Cartmell v. Cartmell,* 164 Pa. Superior Ct. 108, 63 A. 2d. 691.

Conceding then, the libellant was the target for, and the recipient of, unmerited, grave and continued abuse,

nevertheless an essential of indignities is missing,—to wit, a deliberate, insulting and humiliating intent such as may emanate from a mind not weakened by disease or nervous disorder. As stated in *Crock v. Crock*, 96 Pa. Superior Ct. 377, 383, "The situation of the husband doubtless is, and has been, a most unfortunate one, requiring patience and forbearance, but the law does not recognize this as a ground for divorce." A divorce was there refused because the respondent was a "sick woman," "suffering with hysteria and 'had a very marked emotional disturbance,' " and *her conduct resulted largely from her highly nervous state* which "was caused by her physical condition."

The respondent's position, too, is most unfortunate. In 1925, while enroute to the Cleveland Clinic, Cleveland, Ohio, where she was hospitalized for a few days, her nervous condition was so bad that she attempted to wreck the automobile by grabbing the steering wheel. Again, in 1931, she was confined to a hospital (unnamed) for a few days, shortly after the death of her mother. For the next few years the respondent had no hospital treatment which, we may reasonably infer, was due to libellant's reluctance to consider commitment of his wife to a mental institution, either because of his affection for her or because of the clash with his pride. However, beginning in March or April, 1940, when she was admitted to the Mercy Hospital for eleven or fourteen days, the respondent was a recurrent patient of numerous hospitals. She remained at home only two or three days after her discharge from the Mercy Hospital when she was obliged to enter the Butler County General Hospital, where she remained for three weeks. After two weeks at home under the care of her own nurse, she was then sent to the Mercer Sanitarium where she underwent treatment for eight or ten weeks. She next was admitted to the Overlook Sanitarium where she spent another ten weeks. The intervals at home between these

hospitalizations did not exceed two weeks. Grove City Osteopath Hospital was then entered and there she stayed for three weeks, during which time she had "an inward operation, lacerations from child birth . . . had teeth pulled, tonsils out, slight tumor and lacerations all taken care of in one operation." Upon her discharge she was sent to her brother in Detroit, Michigan, stayed there a few days and then returned to Butler. After the lapse of two weeks she was taken to the St. Francis Hospital, Pittsburgh, where she was treated as a mental patient for five or six months. When discharged from there she was again sent to the same place in Detroit, stayed there a few weeks and upon her return to Butler the libellant allegedly was in Atlantic City with Mary Brigamen and the latter's sister. Only a week or two passed, when on August 23, 1941, respondent was committed to the Torrance State Hospital where she was treated until April 10, 1942. She was then released on condition that she would live with her brother in Detroit and not ask for too much maintenance. She returned to Butler in 1944 at which time neither party made any serious effort to effect a reconciliation.

The respondent defended this action by merely denying the allegations of the acts of indignities, which negations were properly found to possess little weight. The libellant has both in his direct and cross examinations developed and supplied the reasons for the hospitalizations and from such evidence we have no alternative, except to conclude that the acts of alleged indignities lack the essential of that deliberate, insulting and humiliating intent, because here the mind was distraught by disease and serious nervous disorder.

Libellant testified: "In the first part of June, 1925, my wife had been sort of nervous I thought and I wanted to keep her happy and I went and asked her if she should have a doctor . . . . I went to see Dr. Maxwell and I complained to him that for a few days after he had been

to see her everything was all right, and then she was worse. He examined her there in his office. He told her there was nothing wrong with her but her nerves. I went back home that night. A day or so after that I didn't know what else to do again. He said, 'Why don't you take her to Cleveland Clinic.' We started to the Cleveland Clinic . . ." Libellant's counsel cross-examined the respondent at great length to gain an admission from her that the medical and mental treatments were recommended to dissipate her bitterness toward her husband. From the course of such examination and the questions propounded by respondent's counsel it is apparent respondent believed her attitude toward him was the result of some disease. Dr. D. Gordon Jones, called in rebuttal by libellant, testified: that he knew something about the domestic difficulties of Mr. and Mrs. Glass; that he treated the latter for six or eight years; that he observed her bitter feeling toward her husband; and that after examination of Mrs. Glass and consultation with his partner, Dr. McCollough, he recommended she be hospitalized. With some detail he testified: "Q. Do you know of your knowledge of Mr. Glass insisting that she come home from these institutions and that they try it again? A. Yes, Mr. Glass tried those things. Q. Were some of those against the advice of the doctors? A. They were. Q. But he insisted that she be taken out? A. Yes. . . . Q. After she was home for a short period there was trouble with her again? A. Yes. . . . Q. Do you know of Mr. Glass being advised for periods not to see his wife at all while she was hospitalized? A. That is usually the custom in all those institutions where we have cases in those conditions. Q. That was true in this case? A. Yes. Q. Did you personally advise him at times to refrain from seeing her or upsetting her? A. It always caused trouble when Carl would get in touch with her. . . . Q. What would you say is the cause of her attitude toward him if you know? A. In our terms

we would call it a clashing of personality, it is just like two people get together, and they just don't coöperate." On cross-examination of Dr. Jones by respondent's counsel, the following was developed: "Q. Mrs. Glass had had some nervous troubles and distresses as you say extending over the last eighteen years. Professionally could you hold her strictly unaccountable for all? A. In dealing with women we must consider the menopause. Q. It is not unusual is it, Doctor, as woman approaches that period of life and during it that she sometimes does things she never did before in her married life and sometimes the association toward the other spouse changes entirely? A. That's right. Q. Wasn't this a rather drastic treatment of this woman to submit her to various sanitariums. Would that tend to eliminate the condition in any way? A. Sure, that was the sort of treatment she required. . . . Q. The treatment you recommended and the hospitalization were in the hopes that possibly that would effect a cure? A. That's right. . . . I would say it the other way, that it was necessary to send her away because she had these physical and mental disturbances. . . . Q. What I'm getting at is this, when a person develops the type of condition which you recommended these treatments and hospitalization for she is not entirely normal? A. That's exactly right. Q. And in that condition she might do things that she wouldn't otherwise normally do? A. You are right. Q. And it was in order to cure her condition that these treatments were recommended? A. That's right."

As already indicated unusual conduct resulting from illness cannot be made the basis for divorce on the ground of indignities. *Crock v. Crock,* 96 Pa. Superior Ct. 377; *Grey v. Grey,* 113 Pa. Superior Ct. 215, 172 A. 412. In this case as in *Wiley v. Wiley,* 125 Pa. Superior Ct. 547, 555, 190 A. 363, the respondent did not attempt to defend her conduct or assign any circumstances of extenuation therefor [she merely denied acts

of alleged indignities]; but unlike the *Wiley* case, it does appear in the evidence through libellant's medical witness that respondent was undergoing her menopause, and that she had undergone frequent hospitalizations because of mental illnesses and had undergone one operation to remedy physical ailments. We must scrutinize with care the facts voluntarily supplied by libellant to determine whether the conduct upon which libellant plants his claim for divorce possesses all essentials of indignities. It must be remembered that the Commonwealth is a party to all divorce proceedings and, further, it is still the unbending rule of this Commonwealth that a divorce decree must be founded upon compelling, imperious reasons, and upon evidence that is clear and convincing. *Hartley v. Hartley,* 154 Pa. Superior Ct. 176, 35 A. 2d 591.

In *Schulze v. Schulze,* 33 Pa. Superior Ct. 325, 330 this Court, RICE, P. J., said: "There is a manifest and very substantial difference between a course of conduct consisting of false, malicious, abusive, humiliating and insulting accusations persistently, continuously, and without provocation addressed by the respondent to the libellant, and the scolding and fault-finding attributable to irritability caused by disease or nervous disorder." And in *Fawcett v. Fawcett,* 159 Pa. Superior Ct. 185, 187, 48 A. 2d 23, where the lower court held that conduct arising out of the respondent's hysterical and neurotic condition did not explain or excuse her conduct, it was stated (RENO, J.) : "Here the learned court fell into grave error. Nothing is better established in our law than that ill health both explains and excuses a wife's conduct, and that the acts of a spouse resulting from ill health do not furnish a ground for divorce (citing cases). Whatever may be the form of the marriage ceremony, the celebrants in this Commonwealth take each other 'for better, for worse, for richer, for poorer, in sickness and in health, to love and to cherish . . .': Allen's Appeal,

99 Pa. 196, 200, SHARSWOOD, C. J." Cf. *Stinson v. Stinson,* 163 Pa. Superior Ct. 497, 63 A. 2d 413.

The master and the court below (no opinion filed) committed error by their failure to consider and to properly evaluate the testimony bearing on the respondent's mental and physical ailments in explanation of, or in extenuation of, the alleged indignities. The essentials of indignities have not been shown and a decree in divorce on that ground must be refused.

From what has already been discussed it should be patent that libellant has also failed to establish desertion. When the respondent left Torrance State Hospital, she pursued the directions of the libellant or his doctors. She went to Detroit at his or their behest—to all intents and purposes she was ordered to do so. The testimony of Dr. Jones is to that effect: "Q. Do you know of the time of her discharge from Torrance. Do you recall being consulted by Mr. Glass and that you and Dr. McCullough conferred relative to her condition at that time? A. Yes. Q. What was your recommendation and advice to Mr. Glass at that time? A. I told him the same thing would happen over again if she returned home. Q. Are you familiar with the fact that the release was signed by Mr. Glass from Torrance conditioned upon her going to Detroit with her brother and sister in law? A. That's the way I understand it." Neither during the time she has been in Detroit nor when she visited Butler was there any attempt by either party to reconcile their differences. The respondent had every reason to believe the restrictions of movement imposed upon her when released from Torrance State Hospital were not sufficiently elastic to permit an approach to her husband for any purpose.

Examining the entire evidence in the light of the foregoing principles we conclude the proofs do not square with the required standards and the divorce should not be granted.

The decree is reversed and the libel is dismissed.