Boggs, Appellant, *v.* Boggs.

Argued December 9, 1971. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Nochem S. Winnet,* with him *Sidney M. DeAngelis,* and *Bean, DeAngelis, Kaufman & Giangiulio,* for appellant.

*Stephen A. Sheller,* with him *Paul C. Astor, Stephen G. Yusem, High, Swartz, Roberts & Seidel,* and *Astor & Weiss,* for appellee.

OPINION BY HOFFMAN, J., March 24, 1972:

This is an appeal from the order of the lower court denying the wife-appellant support from her estranged husband.

24

In December, 1969, the husband-appellee married the appellant. This was the second marriage for both, and at the time of the marriage they were in their forties. Prior to the marriage, appellant was institutionalized in a mental hospital for a brief period of time and was considered to be emotionally unstable and mentally disordered by the various doctors who had attended to her. Appellee consulted with several psychiatrists and doctor friends who knew appellant to ascertain if he should marry her in light of her known psychiatric problems. Appellee was advised that he should, but he was warned that appellant suffered from "situational depression". After the marriage took place the relevant events, as set forth by the lower court, were as follows: "[i]n February of 1970, Mrs. Boggs decided that she wanted to go on a honeymoon. When her husband explained that he could not go at that time because he could not get coverage for his duties at the hospital (defendant is the head of the newborn pediatrics department at the University of Pennsylvania Hospital and also on the staff of Children's Hospital) she became bitter and petulant. She expressed her bitterness by three 'suicide attempts'. It is noteworthy that during each attempt she was in close proximity to her husband and his medical expertise and consequently was never in any real danger. In fact, she berated her husband for taking her to a hospital on one occasion saying that he should have handled it himself. On another occasion she emerged from the bathroom and announced, 'I have just taken twenty aspirin tablets, what are you going to do about that?' Mrs. Boggs subsequently admitted that this episode was a mere attempt to garner sympathy and attention and was not designed to be fatal. She also admitted that she had used false threats of suicide in the past, prior to her marriage to Dr. Boggs, to obtain money from her parents.

"Shortly thereafter, the prosecutrix decided that she wanted to go to Germany and again the defendant explained to her that his duties at the hospital precluded such a trip at that time. Mrs. Boggs resolved that she and two of her children would go anyway and requested her husband to procure for her a credit card to finance the journey. Defendant declined to do so and suggested that she use traveler's checks instead. Mrs. Boggs was enraged and, characteristically, stated that she would make the defendant's life miserable; she was true to her word. She stated that she would procure a credit card from another man—one with whom she had been intimate prior to her marriage to Dr. Boggs. She also asked the defendant if he would permit this man to visit her while she was in Germany. She threatened to expose what she conceived to be defendant's 'fraudulent income tax return'. The prosecutrix did in fact go to Germany, returning on July 13, 1970. The cost of the trip, approximately $4,500.00, was charged on another man's credit card and ultimately paid by Dr. Boggs. While there is conflicting testimony on the point, it appears that Mrs. Boggs took her prophylactic diaphragm with her on the trip. Upon her return she told the defendant that she would continue to see other men as she wished [and] . . . her conduct became petty, nasty and brutish—in a word: feral.

"In August of 1970, the prosecutrix launched a campaign of harassment against Dr. Boggs and his daughter, Stephanie, that almost defies belief. Dr. Boggs testified that his wife told him that, 'he would never see such harassment as she could give'. As we noted previously, she was true to her word. Mrs. Boggs ripped the defendant's decorative swords from the hall, broke a model ship, removed antiques from the home, and threatened to burn or sell pictures that had been painted by the defendant's deceased wife. She removed

Stephanie's pictures from their frames and threatened to cut them to pieces. Dog excrement was piled on top of Stephanie's bed (by the prosecutrix or one of her children) and the cleaning woman was told not to remove it. In addition, Mrs. Boggs told Stephanie that placing flowers on her dead mother's grave was a 'sick thing to do'.

"Nor was this all. Mrs. Boggs had her son David sleep in the defendant's bed or call the house late at night knowing that Dr. Boggs would have to answer because he was on call at the hospital. In addition, she prevented calls from being placed to Dr. Boggs from the hospital thereby endangering the lives of innocent infants. She also threatened to ruin her husband's reputation within the medical community in which he worked.

"Finally, the defendant, like his daughter before him, was forced to leave his home. On the evening of September 5, 1970, the prosecutrix had her daughter call the police and tell them that the defendant had assaulted her. The accusation was false. When the police arrived they suggested that one of the parties should leave the premises; Dr. Boggs left although he had to replace the air in his tire to do so.

"Unfortunately, however, the defendant's departure did not end the harassment. On several occasions the prosecutrix would call the defendant's mother and bother her. On one occasion she told the older Mrs. Boggs that, 'I am going to be the biggest golddigger that ever happened; I am going to take this house bit by bit until it belongs to me'.

"At this point the prosecutrix and her brood began to systematically lay waste to the premises. Trees and shrubs were cut and burned in the driveway—to the great detriment of both. The swimming pool was filled and drained repeatedly generating a huge water bill.

Flagstone steps were chipped and broken. Personal property was removed from the house and the locks changed. The defendant's clothing and personal effects were thrown over a neighbor's fence. Boarders were taken into the house without the defendant's knowledge or consent and allowed to use his personal effects."

Based on these findings, the trial court concluded that appellant's conduct as described would entitle appellee to a divorce on the grounds of indignities, and therefore, appellee had a defense to the support action. *Commonwealth ex rel. Young v. Young,* 213 Pa. Superior Ct. 515, 247 A. 2d 659 (1968) ; and *Commonwealth ex rel. McCuff v. McCuff,* 196 Pa. Superior Ct. 320, 175 A. 2d 124 (1961).

Appellant, however, contends that her conduct was induced by mental illness and is therefore excusable, so that her right to support cannot be defeated. *Simons v. Simons,* 196 Pa. Superior Ct. 650, 176 A. 2d 105 (1961) ; and *Fisher v. Fisher,* 154 Pa. Superior Ct. 497, 36 A. 2d 168 (1944).

At the hearing below, appellant called a psychiatrist who testified that throughout her marriage she suffered from an "acute depressive reaction" illness which "has certain characteristics having to do with sleep patterns". This illness, according to the psychiatrist, could cause elements of impulsivity and immaturity in her behavior, and would manifest itself in appellant "taking steps to attract [her] husband's attention".

The lower court, however, in analyzing this testimony, held that appellant's mental illness did not excuse her conduct: "[i]t seems certain that the prosecutrix is not schizophrenic or otherwise psychotic, i.e., she has not lost touch with reality and fully comprehends what she is doing when she does it. She is more prone to depression than the average individual. This could conceivably account for her predilection to 'sui-

cide attempts'. But, as we noted earlier, she has admitted that at least one of these episodes was an attention-getting device and she has admitted employing this tactic in the past. In no event could her other outrageous conduct be ascribed to her depression. There was nothing delusional about this behavior. Her own statements: 'You will never see such harassment as I can give; I am going to be the biggest golddigger that ever happened; I am going to take this house bit by bit until it belongs to me'—belie any suggestion that she was unaware of the nature of her conduct or its purpose."

It has been stated that "conduct which springs from mental ill health, whatever its nature or severity, should be regarded as unintentional and lacking the spirit of hate, estrangement, and malevolence, which is the heart of the charge of indignities." *Stewart v. Stewart*, 171 Pa. Superior Ct. 218, 90 A. 2d 402 (1952). In order for this standard to be applied, the meaning of "conduct which springs from mental ill-health" must be understood. Literal definitions are, however, not helpful. In excusing conduct which has some relationship to mental illness we have variously described the conduct as exusable because it is "involuntary",[1] or because it is "caused" by,[2] "resulted" from,[3] "explained" by,[4] or is "attributable" to emotional or mental imbalance[5] or

[1] *Duchossois v. Duchossois*, 139 Pa. Superior Ct. 1, 10 A. 2d 824 (1940).

[2] *Manley v. Manley*, 193 Pa. Superior Ct. 252, 265, 164 A. 2d 113 (1960).

[3] *Crock v. Crock*, 96 Pa. Superior Ct. 377, 383 (1929) ; *Moyer v. Moyer*, 181 Pa. Superior Ct. 400, 413, 124 A. 2d 632 (1956) ; *Glass v. Glass*, 164 Pa. Superior Ct. 118, 123, 63 A. 2d 696 (1949) ; and *Albrecht v. Albrecht*, 176 Pa. Superior Ct. 626, 633, 109 A.. 2d 209 (1954).

[4] *Albrecht v. Albrecht*, supra ; and *Fawcett v. Fawcett*, 159 Pa. Superior Ct. 185, 187, 48 A. 2d 23 (1946).

[5] *Benjeski v. Benjeski*, 150 Pa. Superior Ct. 57, 60, 27 A. 2d 266 (1942).

because in the alternative such imbalance was "responsible"[6] for the conduct.

However described, the degree of emotional and mental disturbance which excuses conduct, which would constitute indignities if performed by a non-disturbed person, has been set forth in the cases cited in footnotes 1-6, above. These cases involved a variety of fact situations. It is clear from a review of these authorities that a person need not be "insane" in order for his conduct to be excused. *Stewart v. Stewart,* supra. Such conduct may be excused even if more offensive than that of the wife in the instant case. See *Crock v. Crock,* supra.

It is sufficient to excuse such conduct if the person performing the conduct suffers from "a hysterical and neurotic condition" which makes her "ill and nervous". *Fawcett v. Fawcett,* supra. This, in *Fawcett* we reversed the finding of the lower court that the wife had committed indignities. We held instead that even if she did not suffer from a psychosis or an illness which compel her to act in a certain manner, she may still have a mental or emotional condition which so affects her as to contribute significantly to her offensive behavior. In such circumstances a wife has a defense to the husband's claim that her conduct on its face constitutes grounds for divorce and bars her right to support.

This is particularly the case when, as here, the husband claims that the wife has committed indignities as opposed to committing adultery. Where the husband claims that the wife has committed adultery, such conduct would be excused only by a showing that the wife suffers from a mental disturbance of far greater magnitude than would excuse her conduct if she had committed indignities. As we said in *Manley v. Manley,*

---

[6] *Castner v. Castner,* 159 Pa. Superior Ct. 387, 48 A. 2d 117 (1946).

193 Pa. Superior Ct. 252, 265, 164 A. 2d 113 (1960).
"[c]are must be taken not to confuse the mental or
physical ill health which we have held to be a defense
to indignities, with the insanity which has been held in
other states, and which we here hold to be a defense to
adultery. A wife's neglect of her home and her husband
have been listed among indignities recognized in Penn-
sylvania, but if she fails to cook her husband's meals,
and wash his clothes and clean his house, and if she ne-
glects him generally because she is physically or mental-
ly unable to do otherwise, of course, the neglect does not
constitute an indignity. Furthermore, a person because
of a physical or a mental condition may be irritable and
may spontaneously say and do mean and contemptible
things. If this conduct is *caused* by the physical or
mental condition of a wife-defendant in a divorce ac-
tion, she is excused from them *on the theory that such
conduct lacks the spirit of hate, estrangement and ma-
levolence which is the heart of the charge of indignities.*"
(Emphasis in original.)

Further, where "a man marries a woman whom he
knows is emotionally unstable and temperamental," he
is charged with that knowledge and the law requires
of that husband even more "patience and forbearance"
than would be the case where the husband did not
initially "deliberately [choose]" such an emotionally
and mentally frail woman as his wife. *Fawcett v. Faw-
cett,* supra, at 187.

The lower court, therefore, should have made more
extensive findings in connection with the impact of
appellant's emotional and mental state upon her con-
duct, both as it was understood by the husband at the
inception of the marriage and as it appeared during
the marriage. In this regard it is important to note
that the lower court during the course of the hearings
in this case stated with respect to the husband that "I

think he knew he was marrying a sick woman and maybe thought he could cure her, . . . I have seen something about her and I am satisfied she has psychiatric problems. She had them long before she married this man. This man married her with the knowledge that he was marrying into an area where there was emotional instability. He was a doctor. He was not any callow youth with a lot of hot blood. He is a mature, educated man. And he went into it with his eyes open."

The lower court, in considering the admittedly delicate and complex issues presented in this case, placed stress on the fact that the wife was not psychotic and "has not lost touch with reality and fully comprehends what she is doing when she does it." However, a wife's conduct will be excusable, even though she is not psychotic and does comprehend the meaning of her acts, if she is affected by a mental or emotional disturbance which significantly contributes to her offensive behavior within the meaning of *Fawcett* and the other cases cited above.

Where the wife demonstrates (1) the existence of mental illness, (2) her husband's knowledge of her mental illness prior to the marriage, and (3) her husband's claim of indignities, as opposed to adultery, the trial court must give proper consideration to all these factors in resolving the question of support.

For the above reasons the case is remanded to the lower court for additional findings of fact and a determination of liability for support consistent with the principles set forth in this opinion.[7]

WRIGHT, P. J., would affirm on the opinion of the court below.

---

[7] It should be noted that where a wife has raised a prima facie basis for excusing her conduct, as in the instant case, the burden is upon the husband to establish by "clear and convincing" evidence that the wife's conduct was independent of her mental illness and emotional instability. See *Glass v. Glass,* supra, at 126.