Dougherty *v.* Dougherty, Appellant.

Argued March 20, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Daniel Sherman,* for appellant.

*Daniel J. DiGiacomo,* for appellee.

OPINION BY HOFFMAN, J., April 22, 1975:

In 1970, appellee-husband filed for a divorce a vinculo matrimonii[1] on the grounds of indignities. Appellant-wife filed a counterclaim similarly alleging indignities as a ground for divorce a mensa et thoro.[2] After a master heard testimony and made a report in 1973, the lower court entered a decree in divorce a.v.m. in favor of the husband. The wife appeals from that decree.

The following are the facts as developed at the master's hearing. The parties were married on October 2, 1954, in Conshohocken, Pennsylvania. Both parties testified that their marriage was normal until they were involved in a serious automobile accident in December of 1955. The wife, Joan Dougherty, suffered a concussion, a fractured pelvis, and a crushed heel as a result of the accident and was hospitalized until the spring of 1956. Subsequent to the accident, the couple went to live with the wife's mother. Thereafter, they lived in a series of homes finally purchasing a house in Philadelphia where they resided until the husband left in October, 1970. The parties have one child, John Michael, Jr., born in 1957. Few other "facts" concerning the course of the marriage were agreed to by both parties.

The husband testified as follows: The husband acknowledged that he and his wife had to move into his mother-in-law's home immediately after the accident because his wife was unable to manage a house by herself. He testified that he provided whatever assistance he could in maintaining the house, but that his long hours

---

1. Divorce Law, Act of May 2, 1929, P.L. 1237, §10; as amended Act of March 19, 1943, P.L. 21, §1; 23 P.S. §10.

2. Divorce Law, supra, §11; 23 P.S. §11.

as a member of the Philadelphia Police Department made such domestic help difficult. His wife, however, complained constantly that he was not home often enough, that he should do more housework, and that he was running around with other women.

During 1957, after his wife's condition improved, the husband suggested that the couple move out and live on their own. The wife agreed, but once on their own, she continued to argue with her husband about lack of money and about purchases made for the home. She refused to do housework or to cook for her husband. When he offered to have his mother move in to help care for their home, the wife said " 'I don't want anybody in this God-damn house. This is my house. You are just going to have to help me yourself. If I can't cook, you will have to do your own.' " Despite his assistance, the wife was not placated. Finally, early one morning, after the husband had returned from his men's club, his wife pointed his police service revolver at him and said " 'You God-damn lousy son-of-a-bitch bastard, I am going to kill you . . . Why don't you get out with your whore?' "

Subsequently, the couple purchased a home. Due to a back injury, the husband was no longer able to maintain a second, part-time job in addition to his police work. He, therefore, had trouble meeting their monthly financial commitments. Nonetheless, the wife constantly berated him for having a low-paying job and refused to cook for him or to maintain the house.

In June of 1961, the husband was injured in a motorcycle accident. Thereafter, he retired from the police force and took a job as a schoolbus driver. During that period of their marriage, he came home from work and found paper stuck in all the doors and the gas jets on the stove turned on. He found his wife and asked her what she was doing. "She said, 'I don't want to live.' [He] said, 'Where is Jack?' [their four-year old son].

"She said he was upstairs."

The husband claimed that the complaints about income, housework, and infidelity continued constantly until the time he finally moved out. In addition, he testified that his wife frequently denied him sexual intercourse "as a punishment . . . It was like punishing a kid." Further, she would often tell him to "[g]o sleep with your sister or some of your friends. They will take care of you." He also testified that the couple went to a priest for counselling, but that his wife refused to return or to accept the priest's suggestions. The husband also testified that his wife humiliated him in public and cursed him in front of his son and their relatives. Finally, he stated that his health declined as a result of his wife's treatment of him.

Basically, the wife denied the specific incidents about which her husband testified. She denied ever pointing a gun at her husband or ever attempting suicide. She stated that any reference to "other women" was a joke, that she did not "nag" him about money, that she never cursed him, and that she thought his job with the police force was a good one. Her account of her refusal of sexual intercourse differed markedly from that of her husband: she stated that the only time she refused her husband sexual relations was when she was physically unable to have such relations or when he was too drunk.

The wife agreed that they argued as often as three times a week, but she considered that about normal for a married couple. She found fault in her husband's actions because although she was unable to do some of the heavy cleaning, he refused to assist her with housework. Further, she stated that she always cooked and did whatever housework she could manage. She also objected to her husband's frequent excessive drinking and his unwillingness to take her out socially.

Finally, she testified that she attempted always to be a good and dutiful wife and that she loved her husband throughout the duration of their marriage.

The master filed his report on November 9, 1973, in which he recommended that a decree in divorce a.v.m. be granted in favor of the husband. The attorney for the wife filed exceptions. On August 2, 1974, after hearing oral argument, the lower court dismissed the exceptions and entered the decree in divorce a.v.m.

In her appeal, the wife first contends that the factual findings of the master are "one sided, prejudicial, and not based upon the evidence presented." The wife complains that the master's report included "no statement as to the testimony or the credibility of the witnesses."

Initially, it is obvious that a master is not required to state specifically why he or she credits some testimony, but not other testimony. Particularly in a case such as this which amounts to little more than a "swearing contest", implied in the master's findings is the fact that he found one witness credible, while rejecting the contentions of the other.

Our Court must make a plenary review of the record, even as to matters of credibility. *Gehris v. Gehris,* 233 Pa. Superior Ct. 144, 334 A.2d 753 (1975); *Eifert v. Eifert,* 219 Pa. Superior Ct. 373, 281 A.2d 657 (1971); *Del Vecchio v. Del Vecchio,* 169 Pa. Superior Ct. 617, 84 A.2d 261 (1951). "The obvious important exception to de novo review by a reviewing court is that great weight must be accorded to the findings of the court or master below if the issues of credibility are ones that are necessarily resolved by personal observations. For example, if the ultimate decision rests on a statement asserted by one party and denied by the other, where there is no corroborative evidence, demeanor on the stand is necessarily dispositive of the issue and is the kind of evidence that cannot effectively be reviewed by an appellate court." *Gehris,* supra at 148, 334 A.2d at 755.

As in the *Gehris* case, the bulk of the evidence presented in the instant case[3] was the testimony of the two litigants. The master's findings reflect his belief that the husband's portrayal of events was more credible than that of the wife.[4] In addition, our independent review of the record supports the master's findings insofar as those findings credited the husband's testimony. The wife's testimony contains sufficient contradictions and inconsistencies to suggest that she failed to tell the full truth at

---

3. The only evidence introduced other than the oral testimony of the husband and the wife was the oral testimony of the wife's sister and a stipulation of what the wife's sister-in-law would have testified to. Both witnesses denied some of the facts alleged by the husband. But as with the testimony of the parties, the weight of the additional evidence turned on the credibility of the source of that evidence.

4. The pertinent findings of the master are:

"4. The facts adduced by Plaintiff may be summarized as follows: Plaintiff averred that Defendant offered to the person of the Plaintiff such indignities as to render his condition intolerable and life burdensome. A year after their marriage, Defendant began to argue and complain constantly of her ability to handle the house alone, but refused any help in her 'goddam house.' She threatened Plaintiff with his police service revolver, screaming 'I'm going to kill you, you goddam lousy son of a bitch bastard.' They had frequent periods of separation, but Plaintiff always arranged a reconciliation. There always followed arguments. Defendant attempted suicide by gas at one point, while the family was in the house. Defendant told Plaintiff that if he didn't like things, he could get out. She told him to go sleep with his sister. Their sex life had been a nullity for a least the past twelve years. Defendant did not care for the family home or prepare meals for Plaintiff. She called him a son of a bitch, a goddam pig and a bastard habitually in front of their child.

"Defendant told Plaintiff that he could have a divorce. She has refused family counselling and has adversely affected Plaintiff's life and health.

"5. The Master is of the opinion that the facts adduced do constitute grounds for divorce under the Acts of Assembly."

all times.[5] Cf. *Faszczewski v. Faszczewski,* 182 Pa. Superior Ct. 295, 126 A.2d 773 (1956).

The wife next contends that because she introduced evidence of physical illness, the husband then had the burden of proving that any indignities committed by the wife were not caused by her physical injuries.

The wife relies on language from *Boggs v. Boggs,* 222 Pa. Superior Ct. 209, 211, 294 A.2d 925 (1972): "Appellant does not have to establish a prima facie case of insanity to shift the burden of proof to her husband; she need only submit competent evidence that she suffered from a mental or emotional illness which significantly contributed to her behavior." See also, *Boggs v. Boggs,* 221 Pa. Superior Ct. 22, 289 A.2d 479 (1972); *Glass v.*

---

5. On direct examination, the wife denied having fights with her husband about his drinking, about not helping her in the house, or about his having a girl friend. At the same time, she admitted to arguing with her husband at least three times a week. However, she considered that normal for married couples. In addition, when those specific topics were covered on cross-examination, the wife's answers were evasive and confusing. For example: "And when he came home [late at night after drinking at his club], that resulted in arguments, did it not?

"A.: Not really fights. I never went near him.

"Q.: In other words, when he came home you welcomed him home?

"A.: Yes, I did one night, and he made the statement about not having whiskey in the house, and I drank a highball. He said, 'You have been drinking,' and he started bickering back and forth and then quieted down. I let him say what he wanted to say. I will drink when we go out somewhere with someone."

Later in cross-examination, the wife testified as follows:

"Q.: If he stayed there, you would nag at him, would you not?

"A.: No, I didn't really nag. I positively didn't. We bickered.

"Q.: What did you bicker about?

"A.: Because of his drinking and insisting that he belonged to the club, and he would say, 'If you don't like it, you know what you can do.' We didn't argue every night. We had arguments like a normal person would have with their husbands . . ."

*Glass,* 164 Pa. Superior Ct. 118, 63 A.2d 696 (1949). The basis of such a position is that the party suffering from illness does not have "an essential of indignities . . . a deliberate, insulting and humiliating intent . . ." *Glass,* supra at 122, 63 A.2d at 698.

"[This] doctrine must not, however, be pushed to extremes. The guilty spouse cannot excuse . . . mistreatment amounting to indignities by the shallow excuse of nervousness or irritability unfounded in any specific ailment. The law still considers the parties as masters of their own conduct unless legal insanity has intervened . . . or recognizable and definable disease has usurped the will, and the ill-treatment is but the normal manifestation of the derangement of health." 2 Freedman, *Law of Marriage and Divorce in Pennsylvania,* §298 (2nd Ed. 1957). There must be some showing that the indignities were *caused* by the ailment, not merely that a party has suffered from a physical impairment. See *Yeager v. Yeager,* 162 Pa. Superior Ct. 263, 57 A.2d 579 (1948); *Freeman v. Freeman,* 127 Pa. Superior Ct. 557, 193 A. 99 (1937).

In the instant case, there is no dispute that the parties suffered serious injuries in an automobile accident that occurred approximately twenty years ago. It is unclear from the record to what degree the wife suffers a permanent impairment. The husband testified at the master's hearing that his wife was fully recovered from her injuries "[t]o the best of her ability . . .", that she continued to limp, but that she discontinued medical treatments "[b]ack in the fifties." The wife stated that she was permanently disabled due to the accident and that "[a]s far as walking, it is torture." The wife's sister, testifying as part of the wife's case, was asked to describe Mrs. Dougherty's present condition. She stated that "I imagine it takes her a little longer to get around." There was no medical evidence concerning the degree of the injury. More importantly, the wife did not prove that indignities — acts testified to by the husband and testimony believed

by the master — were caused by her injuries. Presumably, her position is that she was unable to do housework because of her injury and that, therefore, she nagged her husband because he would not assist her. The husband, however, testified that he in fact assisted his wife and that he offered to have his mother live with them to alleviate the burden on his wife. In addition, the wife's evidence does not reveal how her permanent injury caused the other indignities — for example, the complaints concerning the husband's income, the accusations of infidelity, the sexual refusals, and the name calling.

Finally, the wife alleges that the husband's testimony failed to prove indignities. The wife's brief takes each specific alleged indignity and cites case law to the effect that such an act alone is not a sufficient ground to sustain a finding of indignities. We believe, however, that viewed collectively, the acts proven were sufficient to prove indignities. See *Gehris,* supra; *Fodor v. Fodor,* 221 Pa. Superior Ct. 321, 292 A.2d 485 (1972); *Gerenbeck v. Gerenbeck,* 199 Pa. Superior Ct. 410, 186 A.2d 49 (1962).

The decree in divorce a.v.m. is affirmed.