381 A.2d 143

**Jerry J. L. B. HARGROVE, II**

v.

**Josephine L. HARGROVE, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 10, 1976.

Decided Dec. 2, 1977.

Page is almost entirely redacted.
Content is redacted.

122

Charles C. D. 'Lundy, Philadelphia, for appellant.

Alfred P. Antonelli, Bethlehem, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge:

Appellant contends that the lower court erred in sustaining the master's recommendation that the parties be divorced and in granting a divorce a. v. m.[1] We affirm the lower court's decree.

On August 11, 1956, appellant-wife and appellee-husband were married in Allentown, Pennsylvania. They have one child, a daughter born on September 27, 1960. On December 30, 1966, appellee filed a complaint in divorce a. v. m. on the grounds of indignities. On November 21, 1974, the lower court appointed a master who conducted a hearing on January 16, 1975. Appellee testified to the following facts: shortly after he married appellant, she began telling him at least 2–3 times a week that she made a mistake marrying him because he was not good enough for her. When appellee was laid off by Bethlehem Steel Corporation, appellant disparaged him; her aspersions depressed appellee. In addition, appellant almost daily accused appellee of infidelity, even though appellee did not give appellant any reason to make these allegations. Appellant often called him a son-of-a-bitch and informed him that she was going to make certain that he could not continue his work as a minister.

In 1960, appellee became the pastor of the Second Baptist Church in Bethlehem. When he moved into the parsonage,

1. Divorce Law, Act of May 2, 1929, P.L. 1237, § 10; as amended Act of March 19, 1943, P.L. 21, § 1; 23 P.S. § 10, as amended. Act of September 22, 1972, P.L. 880, No. 202, § 1.

appellant refused to follow until one month later because she preferred to stay with her mother in Allentown. Even after joining appellee at the parsonage, appellant would frequently return to her mother's house and remain there for periods of time ranging from two weeks to a month. Appellant ignored appellee's pleas to return. Appellee drove appellant to Allentown so that she might use her mother's washing machine, but he did not know that appellant intended to remain in Allentown for these extended periods of time. In 1962, appellant left appellee without advance warning or justification. This separation plus the earlier sporadic separations caused appellee great embarrassment and prompted the circulation of derogatory rumors throughout the church community. In 1964, appellant filed a divorce action against appellee; she later discontinued this action. In 1965, and 1967, appellant requested the Church Board of Deacons to investigate her suspicions that appellee indulged in adulterous relationships. The Board talked to appellee and appellant and recommended that they reconcile their differences.

In 1968, appellant unexpectedly returned to appellee's residence. The parties shared a common residence from 1968, until July 4, 1973, but maintained separate bedrooms and ate their meals in separate rooms and at separate times. Appellant and appellee engaged in sexual intercourse on no more than three or four occasions during this period. Appellant and appellee argued frequently, causing appellee to endure a continuous state of nervousness. Appellant also related the substance of family arguments to appellee's neighbors and fellow church members, thereby causing appellee extreme embarrassment and endangering his position as pastor. On July 4, 1973, appellant left appellee, once again without notice or cause. The parties have not lived together since that date. Finally, appellee testified that he provided well for his wife and child, that he had been a good and dutiful husband and father, that he did everything he could to make his marriage work, and that he did not contribute to the collapse of his marriage.

Appellant proffered a radically different version of events during her 19 years of marriage. She testified that on various occasions, appellee had pointed a rifle at her back, assaulted her, cut some skin off her neck with a butcher knife because she had burned dinner, threatened to kill her, called her "bitch," and told her to go to hell. In 1968, she brought a charge of assault and battery against appellee, but later dropped the charges. She testified that appellee carried on numerous affairs with other women. In particular, on one occasion, appellee told appellant that the only person he cared about in the world was another woman and that he only married appellant to spite this other woman. She also alleged that she found love letters and postcards to appellee from another woman. She introduced one such letter, allegedly written in 1967 by someone named "Dee", into evidence and claimed that the letter established a romantic link between appellee and one Delores Smith who lived in Virginia.

Appellant testified that her sporadic stays in Allentown with her mother prior to the 1962 separation were the result of appellee's refusal to transport her back home rather than her preference for living with her mother. She asserted that appellee constantly accused her of infidelity without any reasonable basis for such charges. She admitted calling appellee before the Board of Deacons on two separate occasions, but claimed that she did this in order to heal a festering sore in the church community stemming from rumors of her husband's infidelity.

In 1968, appellee requested that appellant return to the marital abode and she complied. From 1968, to July 1973, the parties engaged in sexual relations on the average of 2–3 times a month. During this period, appellee deserted appellant on numerous occasions for periods ranging from one to two weeks. She testified that she had been a good wife and mother, but she wondered if she had been partially at fault in causing the marital breakdown. She admitted that she was jealous of appellee.

When questioned on cross-examination, both parties denied each other's allegations and countercharges. Neither side presented corroborative testimony or documentary evidence with the exception of one letter allegedly demonstrating appellee's infidelity. The master chose to believe appellee rather than appellant and, consequently recommended that the lower court grant a divorce a. v. m. On March 31, 1976, the lower court dismissed appellant's exceptions to the master's report and entered a decree of divorce a. v. m. This appeal followed.

Appellant first contends that the lower court erred in accepting the master's recommendation because his report erroneously credited appellee's testimony and because the master never specifically found that appellant's testimony was not believable. In *Gehris v. Gehris*, 233 Pa.Super. 144, 148, 334 A.2d 753, 755 (1975), we articulated the legal guidelines controlling our review of this contention:

> "The law is clear that when a divorce matter is heard by a judge sitting without a jury, this Court must make a complete and independent review of the record of the proceedings below. *Eifert v. Eifert*, 219 Pa.Super. 373, 281 A.2d 657 (1971). The Court's review extends even to matters of credibility. *Del Vecchio v. Del Vecchio*, 169 Pa.Super. 617, 84 A.2d 261 (1951). The Court must 'examin[e] the record to discover inherent improbabilities in the stories of the witnesses, inconsistencies and contradictions, bias and interest, opposition to incontrovertible physical facts, patent falsehoods. . . .' 12 P.L.E. § 143 Divorce; see also, *Faszczewski v. Faszczewski*, 182 Pa.Super. 295, 126 A.2d 773 (1956); *Rankin v. Rankin*, 181 Pa.Super. 414, 124 A.2d 639 (1956). The obvious important exception to de novo review by a reviewing court is that great weight must be accorded to the findings of the court or master below if the issues of credibility are ones that are necessarily resolved by personal observations. For example, if the ultimate decision rests on a statement

asserted by one party and denied by the other, where there is no corroborative evidence, demeanor on the stand is necessarily dispositive of the issue and is the kind of evidence that cannot effectively be reviewed by an appellate court. See, *Rankin*, supra; *Uhlinger v. Uhlinger*, 169 Pa.Super. 574, 83 A.2d 423 (1951); . . . ."

We reiterated this approach in *Dougherty v. Dougherty*, 235 Pa.Super. 122, 127, 339 A.2d 81, 84 (1975), and added that: "[A] master is not required to state specifically why he or she credits some testimony, but not other testimony. Particularly in a case such as this which amounts to little more than 'a swearing contest,' implied in the master's findings is the fact that he found one witness credible, while rejecting the contentions of the other."

In the instant case, only two witnesses testified: appellant and appellee. In his report, the master, after a searching analysis of the evidence presented,[2] concluded that the testimony of the two parties was irreconcilable, and because neither party presented corroborating witnesses or evidence, his assessment of the parties' credibility governed the case. In short, the master properly found that the instant case amounted to a "swearing contest."[3] He stated that appel-

2. The master filed a thorough 30 page report in which he made 46 findings of fact.

3. Appellant did introduce into evidence one letter allegedly demonstrating appellee's infidelity, but "as with the testimony of the parties, the weight of [this] additional evidence turned on the credibility of the source of that evidence." *Dougherty v. Dougherty*, supra 235 Pa.Super. at 128, 339 A.2d at 84. Appellant contended that appellee engaged in an extramarital affair with one Delores Smith and as proof of this affair offered a 1967 letter allegedly written to appellee and signed "Dee." She testified that she found this letter in appellee's briefcase; appellee countered by testifying that he never received this letter. Appellant did not introduce any evidence tending to prove that appellee had an affair with a Dolores Smith, purportedly the "Dee" who wrote the letter. Moreover, she could not authenticate the signature. Finally, the master noted that the letter was clearly hearsay insofar as it was offered to prove an extramarital love affair instead of merely impeaching appellee's testimony that he never received any love letters. We believe that the master and the lower court properly discredited this letter because it was unauthenticated hearsay without any corroborating support in the record.

lant appeared reluctant to answer several questions,[4] that she contradicted herself often,[5] and that her testimony was ambiguous and confusing, especially with reference to dates, times, and places.[6] By contrast, the master found appellee to be a convincing and credible witness who presented his testimony in an honest and straightforward manner. Our independent review of the record supports the master and the lower court insofar as each credited the husband's testimony and discredited the wife's testimony because of contradictions and inconsistencies. See *Dougherty v. Dougherty*, supra; *Gehris v. Gehris*, supra.

Appellant next contends that appellee failed to establish sufficient indignities to his person to justify the granting of a divorce decree a. v. m. Section 10(f) of the Pennsylvania Divorce Law, supra, provides *inter alia* that: ". . . [I]t shall be lawful for the innocent and injured spouse to obtain a divorce from the bond of matrimony, whenever it shall be judged, . . . that the other spouse: . . . [s]hall have offered such indignities to the person of the injured and innocent spouse, as to render his or her condition intolerable and life burdensome." While our appellate courts have been reluctant to formulate a general definition of what constitutes "indignities," we have noted that indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional inci-

4. Appellant insinuated that appellee had an affair with one Faith Strong, but she showed considerable reluctance to answer when asked if appellee or his alleged paramour had ever admitted having a meretricious relationship.

5. For example, at one point, appellant testified that she wondered whether she had been responsible for the breakdown of the marriage because of her jealous attitude towards her husband. Shortly thereafter, appellant testified that she never gave appellee any cause to wish to end the marriage. Appellant also alleged that appellee was not an innocent and injured spouse because of his extramarital affairs, but she stated that she did not accuse appellee of any wrongdoing with respect to his relationships with other women.

6. Appellant gave a very confusing account of why she requested the Board of Deacons to investigate appellee's rumored infidelity. Moreover, appellant could not even coherently inform the master of her present residence.

vility, manifest disdain, abusive language, or malignant ridicule. *Gehris v. Gehris*, supra, 233 Pa.Super. at 147–48, 334 A.2d at 754–755. See also *McKrell v. McKrell*, 352 Pa. 173, 42 A.2d 609 (1945); *Sells v. Sells*, 228 Pa.Super. 331, 323 A.2d 20 (1974); *Fodor v. Fodor*, 221 Pa.Super. 321, 292 A.2d 485 (1972); *Gerenbeck v. Gerenbeck*, 199 Pa.Super. 410, 186 A.2d 49 (1962). We believe that appellee introduced sufficient evidence to establish the perpetration of indignities by his wife. Appellee testified that appellant began to belittle him incessantly shortly after his marriage. Appellant constantly accused him of infidelity, called him names and argued with him. She would spend weeks at her mother's home without warning appellee of her intentions in advance or heeding appellee's pleas to return. This conduct humiliated appellee and made him nervous; it also resulted in rumors and suspicions which adversely affected appellee's position as a minister. Appellant even brought appellee before his church's Board of Deacons on two separate occasions on charges of infidelity. Appellant left appellee in 1962 and remained away until 1968 when she suddenly returned. In 1973, appellant left again, and the parties have not lived together since that time. Despite appellee's efforts to reconcile the parties' differences, the marriage failed. Appellee's testimony, credited by the master and the lower court, establishes that appellant's conduct made appellee's condition intolerable and life burdensome and caused the disintegration of the parties' marriage. *Griffie v. Griffie*, 220 Pa.Super. 461, 289 A.2d 198 (1972).

Appellant next asserts that appellee could not rely upon his uncorroborated testimony to establish indignities because appellant's testimony contradicted and shook appellee's testimony. *Baxter v. Baxter*, 192 Pa.Super. 62, 159 A.2d 533 (1960). In *Schrock v. Schrock*, 241 Pa.Super. 53, 60, 359 A.2d 435, 439 (1976), our Court stated that: "[A] divorce may be granted upon the uncorroborated testimony of the plaintiff unless, of course, that testimony 'is not only contradicted but shaken by the defendant.'" See also *Regan v. Regan*, 227 Pa.Super. 552, 322 A.2d 711 (1974); *Hanna v.*

*Hanna*, 195 Pa.Super. 309, 171 A.2d 646 (1961); *D'Alessandro v. D'Alessandro*, 187 Pa.Super. 194, 144 A.2d 445 (1958); *Hansell v. Hansell*, 182 Pa.Super. 158, 126 A.2d 509 (1956); *Miln v. Miln*, 175 Pa.Super. 613, 106 A.2d 862 (1954); *Frantz v. Frantz*, 134 Pa.Super. 48, 3 A.2d 987 (1939); Freedman, *Law of Marriage and Divorce in Pennsylvania*, § 744 at 1385. (2nd Ed.1957). We believe that appellant's testimony contradicted but did not "shake" appellee's testimony. The master chose to believe appellee's testimony and found appellant to be an evasive, contradictory and confusing witness. The record supports the master's assessment of the competing testimony. As we observed in *Schrock v. Schrock*, supra, a party's testimony is not "shaken" merely because his or her spouse denies the damaging parts. See also *Arcure v. Arcure*, 219 Pa.Super. 415, 281 A.2d 694 (1971). *D'Alessandro v. D'Alessandro*, supra; *Hansell v. Hansell*, supra; *Miln v. Miln*, supra; Freedman, supra, § 758 at 1395–96.[7]

Appellant next argues that the master and the lower court erred in relying upon events after the 1962 separation and after the filing of the divorce complaint in December, 1966, in finding that appellee had established grounds of indignities. Appellant did not object to the admission of this testimony at the master's hearing. Moreover, we have stated that: "Evidence of what occurred after the separation and filing of the libel [is] relevant for the purpose of shedding light upon the nature of the atmosphere

7. Freedman makes the following pertinent observation: "A rule of frequent application has been formulated that 'a decree may be supported by the testimony of the complainant alone, but if this testimony be contradicted and shaken by the respondent and there be no convincing circumstances warranting a disregard of the contradictory evidence, a case has not been made out'. This rule has at times been applied as if it were a rigid and absolute formula. Such an application of the rule would make the defendant's contradiction an unfailing neutralization of every plaintiff's uncorroborated case. Manifestly, however, the ultimate decision must rest upon the credibility of the parties. Since the plaintiff is a competent witness a decree may be founded upon his testimony alone even if it is uncorroborated and although it may be contradicted by the defendant." Freedman, supra, § 758 at 1395–96. (Footnotes omitted).

existing while the parties lived together, and discloses a continuation of the humiliation and incivility to which libellant had been subjected from the beginning of his married life." *Martin v. Martin*, 157 Pa.Super. 538, 542–43, 43 A.2d 637, 640 (1945). See also *Schrock v. Schrock*, supra; *Boyer v. Boyer*, 183 Pa.Super. 260, 130 A.2d 265 (1957); *Glick v. Glick*, 170 Pa.Super. 142, 84 A.2d 248 (1951). We believe that all of this testimony was properly received by the master and that there was sufficient evidence of occurrences constituting indignities prior to the separation, to justify the granting of a divorce decree.

Appellant next contends that appellee delayed too long in instituting and proceeding with this divorce action. In *Regan v. Regan*, supra, 227 Pa.Super. at 554, 322 A.2d at 713, we said: "There is no general statute of limitations applicable to divorce actions and generally mere delay in bringing a divorce action is not a ground for denial of the relief sought. *Larsen v. Larsen*, 184 Pa.Super. 221, 132 A.2d 883 (1957). However, long delay in bringing a divorce action after separation casts doubt on the good faith of the plaintiff. *Orme v. Orme*, 177 Pa.Super. 209, 110 A.2d 870 (1955)." See also *Campbell v. Campbell*, 205 Pa.Super. 207, 208 A.2d 36 (1965); *Walper v. Walper*, 198 Pa.Super. 409, 182 A.2d 209 (1962); *Gillen v. Gillen*, 195 Pa.Super. 60, 169 A.2d 340 (1961). In the instant case, however, the lower court, endorsing the findings of the master, found that: "[A]ppellee made repeated attempts to resolve the problems with his wife and to have her return to live with him. He displayed extreme patience in dealing with his wife and only decided to proceed with this action after it became perfectly obvious that the marriage could not be saved. This enhances [appellee's] good faith. If the delay in the proceeding is to be blamed upon anyone, it was [appellant] who caused the delay by her frequent false reconciliations, which led [appellee] to believe that he might be able to change her behavior." We will honor the conclusion of the master and the lower court that appellee acted in good faith in proceeding with this action and we will not penalize appellee for earnestly attempting to save his marriage.

 Finally, appellant contends that appellee's ostensible reconciliation with her from 1968 to 1973 conclusively established that her conduct did not render appellee's condition intolerable and his life burdensome. However, as noted by the lower court, reconciliation is not a complete defense to an action for divorce on the grounds of indignities. Instead, it is merely a factor to consider in evaluating the severity of a defendant's conduct. *Moyer v. Moyer*, 181 Pa.Super. 400, 124 A.2d 632 (1956); *Hahne v. Hahne*, 168 Pa.Super. 324, 77 A.2d 682 (1951). In the case at bar, while the parties did reside together between 1968, and 1973, the master and the lower court accepted appellee's testimony that he and his wife slept in separate bedrooms, ate meals separately, and continued to argue. We agree with the lower court that the mere fact that the parties lived together from 1968–1973 does not compel us to find that appellant's behavior did not make appellee's life intolerable.

Because we conclude that appellant presents no meritorious contentions, we affirm the decree of the lower court granting a divorce a. v. m. in favor of appellee.

The decree in divorce a. v. m. is affirmed.

CERCONE, J., dissents.

VAN der VOORT, J., files a dissenting opinion.

SPAETH, J., files a dissenting opinion in which VAN der VOORT, J., joins.

SPAETH, Judge, dissenting:

Many cases say that when the testimony in a divorce case has been heard by a master, this court must review the testimony "de novo" while at the same time giving the master's findings on credibility "the fullest consideration." This sounds like an instruction to write one's solution to a problem on a clean blackboard without erasing the solution already written there by some one else. Accordingly, in *Coxe v. Coxe*, 246 Pa.Super. 231, 369 A.2d 1297 (1976), I collected the cases and concluded that one could make some sense of them by adopting the following rule:

> If we do not take "de novo" too literally, and if we make an earnest effort to give the master's findings on credibility "the fullest consideration", I think that at least in most cases we shall not miss the mark by much. If in a given case we conclude to reject the master's findings, we should explain in detail the basis of our rejection. Thereby we shall avoid, at least as much as possible, the danger of making an arbitrary decision.
>
> *Id.* 246 Pa.Super. at 255, 369 A.2d at 1309 (dissenting opinion).

I propose to apply this rule here, first considering the master's findings and then reviewing the testimony "de novo." This done, it will be in order to discuss what is the most appropriate remedy.

1: *The Master's Findings*

The majority characterizes the master's report as "a searching analysis." Majority opinion at 128. My own appraisal is not so generous. After giving the master's findings the fullest consideration, I have concluded that they should be rejected. I shall explain the basis of this rejection by discussing in detail three particular aspects of the master's report.

–a–

When one compares the master's report with the record, one finds important instances in which the master quotes the wife's testimony out of context. Sometimes, indeed, the master seems to state his findings as though he were not the lower court's surrogate but the husband's advocate. One result is that the report gives quite a misleading impression of the wife's testimony.

In Finding 38 of his report the master says:

> 38. Defendant admitted stating to Plaintiff that "if you feel that way, Jerry, why don't you step completely out of my life." (N.T. 64.)
>
> Record 180a.

This implies that the wife admitted that she sought a divorce. In fact she said that it was her husband who wanted to come and go as he pleased, and that it was he who sought a divorce:

> Q. Either way. On August 10th, what was the reason that you came back to Pawnee Street?
>
> A. I returned because Mr. Hargrove had been continually asking me to return. And, I had decided at one time to return and then I changed my mind because Mr. Hargrove had called me and he said to me that I had been used to doing what I wanted to do and he had been used to coming and going as he wanted to do. And, he said he thought at this point we should get a divorce. I asked him then, I said, "if you feel that way, Jerry, why don't you step completely out of my life."
>
> Record 69a.

In Finding 39 of his report the master says:

> 39. Defendant admitted living at the parsonage off and on until 1963. (N.T. 83.)
>
> Record 180a.

This implies that the wife admitted that she would leave the parsonage improperly. Her testimony was:

> Q. So you were living at the parsonage off and on until 1963?
>
> A. Yes, I was. Yes, I was because at that time when my mother took ill I asked my husband his permission to go to my mother, and he gave me his permission to go. I did not leave without permission.
>
> Q. And he drove you there?
>
> A. And he drove me there, yes.
>
> Record 87a.

In Findings 43, 44, and 45 of his report the master says:

> 43. Defendant on her direct examination was asked by her attorney, "Did you give Mr. Hargrove any reason to act the way he did towards you?" And she answered, "Yes".
>
> (N.T. 98.)

44. She was further asked by her attorney, "You have testified as to all these things he had done to you. Were any of these things your fault?" And she responded, "I don't know, I really wonder in a sense . . . ." (N.T. 98.)

45. Further, she was asked, "Was that true, were you jealous of Mr. Hargrove?" And she replied, "Yes." (N.T. 98.)

Record 181a.

These three findings complete the master's depiction of a wife who by her own testimony has acknowledged that she was at fault. In fact her testimony was:

Q. During your marriage to Mr. Hargrove, were you a good and dutiful wife to him?

A. I tried to be.

Q. Did you ever, I believe you have already testified about your duties as a housewife, I believe you said you cooked and cleaned and did the laundry, is that correct?

A. Yes.

Q. Did you take care of your child?

A. Yes, I did.

Q. Did you act as a good wife toward your husband and a good mother toward your child?

A. I tried to.

Q. When you say you tried to, I do not mean to be over schematic but we must get it on the record, in your opinion did you succeed, were you a good wife?

A. I'll say yes.

Q. And were you a good mother?

A. Yes, to the best of my ability.

Q. Did you give Mr. Hargrove any reason to act the way he did toward you?

A. Yes.

Q. You have testified as to all these things he had done to you, were any of those things your fault?

A. I don't know, I really wonder in a sense. Mr. Hargrove has said, has often said the statement that I have

been in competition with him and I have been trying to tear him down for years. I know I did attend the Bible Institute with Mr. Hargrove, and different ones even within the church have felt that there was a jealousy between us because of this.

Q. Was that true, were you jealous of Mr. Hargrove?

A. Yes.

Q. Did you indicate to him that you were jealous?

A. No. It has been felt Mr. Hargrove has been jealous of me.

Q. To get back to my question, did you ever give him any cause, yes or no, to act the way he did?

A. No.

Record 101a–102a.

–b–

At several points in his report the master criticizes the wife for failing to call any corroborating witness. Record 184a–185a. At no point does the master criticize the husband for failing to call any corroborating witness.

Sometimes the master's criticism of the wife is unsupported by the record. For example: The wife testified that the husband had attacked and choked her in 1968 and again in 1972. In 1968 she filed charges before an alderman but did not press them. After noting these facts, the master says:

> With respect to an arrest for assault and battery in 1972 there was no testimony offered to corroborate such an arrest nor was Defendant's niece called to corroborate the fact that she had even called the police.
>
> Record 185a.

The difficulty with this is that upon reading the wife's testimony one will discover that she never said either that she had had her husband arrested in 1972, or that she had called the police, or that her niece had been present. *See* Record 95a–96a. (She did say that she had been talking to her niece on the telephone when her husband choked her in 1968. Record 94a.)

Even where the master's criticism of the wife's failure to call any corroborating witness seems warranted, it represents (so it seems to me) a curious inversion of emphasis, which is inconsistent with the master's acknowledgment earlier in his report that the husband has the burden of proving his case by evidence "such that the Court can rest its determination thereon with full awareness of its correctness. *McKrell v. McKrell*, 352 Pa. 173, [42 A.2d 609] (1945); *Matovok v. Matovok*, 173 Pa.Super. 267, [98 A.2d 238] (1953); *Jacobson v. Jacobson*, 154 Pa.Super. 449, [36 A.2d 189] (1943)." Record 174a. If anyone is to be criticized for failing to call any corroborating witness it is not the wife but the husband. This is especially apparent when one considers two incidents central to the husband's case.

According to the husband, his wife's conduct made him feel "nervous", Record 23a, "rather apprehensive", *id.*, "bad", Record 35a, and was "very embarrassing", Record 36a, because of its effect on members of his church. Thus he testified: "They [the members] was rumoring, well, they is splitting up and breaking up and then back together." Record 35a. On two occasions, he testified, "my wife decided that she would take me before the Deacon Board with allegations." Record 36a. "The one time was in '65 and the other one around '67." *Id.* On the first occasion:

> She had alleged then that I was going with a woman. And, of course, they listened. As far as they were concerned, they had not seen me involved with anybody, and if there was a problem, they recommended that we resolve it.
>
> Record 36a–37a.

On the second occasion:

> A. The same, some of the same allegations about alleged women that I was supposed to be having affairs with.
>
> Q. And did the Board of Deacons chastise you or were you removed as their minister or any punitive action taken against you?

A. No. Again they said it was mainly that they knew we had been separated, if there was any problems between us, that we should resolve them.

*Id.*

All of this, the husband said, "was very humiliating and very embarrassing." Record 38a.

According to the wife, while she did request the first meeting of the Board of Deacons, the Board asked her to come to the second meeting. Record 99a. On cross-examination she said that the first meeting occurred because of gossip that her husband "was going with" one Mrs. Esther Lee and "spent every night at [her] home." Record 106a. While not clear, her testimony suggests that Mrs. Lee was also discussed at the second meeting. Record 103–105.

On this record I find the husband's failure to call any member of the Board of Deacons, or any one at all from the church, very striking. Was there gossip in the church about the husband going with Mrs. Lee? Was it so extensive that the Board, not the wife, called the second meeting? What did the husband, and what did his wife, say to the Board? Whatever the answers to these questions, the master's failure to ask them while at the same time criticizing the *wife* for not calling any corroborating witness makes it difficult for one to regard the master's report with much confidence.

Nor am I reassured by the majority opinion, which does not comment either upon the master's unfair criticism of the wife or upon the obviousness of the husband's failure to call any one from the church.

—C—

The parties were married in August 1956. Record 12a. Their daughter was born in September 1961. Record 68a. They separated for the first time in February 1962, and remained separated until August 1968. Record 16a. They were together from August 1968 until July 1973, when they separated for the second and final time. *Id.* Although the husband's complaint for divorce was filed in December 1966 (during the first separation), no action was taken on the

complaint until November 1974, when the master was appointed. Record 1a.

It is settled that such a delay creates doubt about the plaintiff's good faith. *Regan v. Regan*, 227 Pa.Super. 552, 322 A.2d 711 (1974); *Orme v. Orme*, 177 Pa.Super. 209, 110 A.2d 870 (1955). Freedman states that the explanation for the delay should be "most satisfactory." Freedman, *supra* at 850–852. Here is the master's discussion of the delay:

> Thus in the instant case, the cause of the absence and withdrawal of the Defendant from cohabitation with the Plaintiff and particularly due with respect to the fact that the parties although married 19 years had been separated according to the record from each other for a period of approximately 8 years and during the time that they were married from 1960 to 1962 the withdrawal from cohabitation and absence from the domicile of the husband certainly would negate any claim that the complaint of the Plaintiff should fall due to the fact that it was not processed and pursued subsequent to the filing of the same in 1966 and for the shorter period from the time that the Defendant absented herself from the husband's domicile in 1973 to 1974 when the Plaintiff moved for the appointment of a Master and a hearing on merits.
>
> Record 196a.

I submit, this is not a "searching analysis."

For its part, the majority explains the delay by "honor[ing] the conclusion of the master and the lower court that appellee acted in good faith in proceeding with this action . . . ." Majority opinion at 132. "[W]e will not [says the majority] penalize appellee for earnestly attempting to save his marriage." *Id.* I find no evidence of such earnestness. My own explanation of the husband's motives is more skeptical.

### 2: *A "De Novo" Review*

I recognize that one judge's "de novo" review may lead to conclusions different from another judge's (that is one problem with "de novo" review). I nevertheless submit that on

the record before us, the husband's case is inherently incredible, and far too weak to sustain his claim to a divorce on the ground of indignities.

--a--

I have already commented upon the husband's failure to call any witness to corroborate his testimony. Uncorroborated, his testimony impresses me as both exaggerated and implausible. Two examples, each concerned with an important aspect of the husband's case, should be enough to illustrate this comment.

(i)

The husband made much of his wife's accusations of infidelity. Thus at one point he testified:

Q. Now you say your wife would accuse you of things, is that correct?

A. Yes.

Q. And what kind of accusations would she make?

A. Well, I believe you will find that she would accuse me about say, from, from any woman I may have been seen with, talked with, any period of time she accused me of that.

Q. Accused you of what?

A. Having an affair with them.

Q. Now, how frequently did these accusations occur throughout the period of your marriage while you lived together?

A. I would say almost every day I would have some kind of comments of this kind.

Q. Was there any truth or justification as far as her accusations were concerned?

A. There was no truth or justification.

Q. Did you give her any reason or cause to suspect that you were being unfaithful to her at that period of time?

A. I didn't give her any cause.

Q. Did she ever confront you with any evidence or any eye witnesses as to any misconduct on your part?

A. No, she never did.

Record 20a–21a.

The worst shrew of all—the Platonic model of shrews—would not accuse her husband of infidelity "almost every day" of a marriage lasting (as of the date of the master's hearing) for 18 years. Here, then, is a witness who feels very little obligation to testify with at least some precision.

This characteristic of the husband is suggested elsewhere. Thus, later he testified that his wife would accuse him of infidelity "just about all through the whole thing." Record 23a. When pressed to say what he meant, he replied, "I would say, weekly, sometimes twice a week . . . ." *Id.* Even with this modification, however, what of the fact that he was separated from his wife for a third of the time (from 1962 to 1968)?

In addition, common sense tells one that if a wife is jealous of her husband, a confrontation is likely. It is therefore important to consider the husband's denial that his wife ever confronted him with any evidence of his misconduct. On cross-examination the husband denied any intimacy with one Delores Smith.[1] The wife then produced a letter addressed to the husband, dated and postmarked March 25, 1967, from Richmond, Virginia (where the husband had admitted Miss Smith—or at least her family—lived, Record 57a–58a), and signed "Dee" (which according to the wife was Miss Smith's nickname, Record 144a). The wife testified that she had taken this letter from her husband's briefcase. Record 144a. In rebuttal the husband testified that he had never received or even seen the letter; his suggestion was that "[i]f anything, it was intercepted at the door." Record 160a. One may perhaps be pardoned for surmising either that the husband did receive the letter, or that if the wife did intercept it, she confronted him with it.

1. It may be remarked in passing that his testimony appears notably evasive. For example:

Q. Is it not true that you ran up over a thousand dollars worth of telephone bills talking to Miss Delores Smith?

A. I never computed the bills.

(ii)

It is acknowledged that the wife returned to her husband. When asked why she had, the husband testified as follows:

Q. Let me back up just a little bit. You say your wife on a permanent basis left you sometime in 1962?
A. Yes.
Q. Now, do you remember when in 1962?
A. I would say it's in February, something like that.
Q. February of 1962?
A. Yes.
Q. And she separated and stayed apart from you until 1968?
A. 1968.
Q. When in 1968?
A. August 11, 1968.
Q. Now, when she returned, you say it was not because of any reconciliation, it was because she just moved back into the house?
A. Yes.

Record 15a–16a.

Later the husband testified:

Q. All right. Now, she, eventually, comes back, right?
A. In 1968.
Q. So at this point you have been separated, approximately, six years, is that correct?
A. Yes.
Q. Now, what were the circumstances of her return in 1968?
A. She just came back, she had a key to the door and she just came in. And, when I arrived home, she was there.

Record 44a.

The wife's testimony was that she returned "because [the husband] had been continually asking me to return." Record 69a. One may entirely discount her testimony; still, I am unable to imagine that after six years, with no prior communications, and for no stated reasons, the wife "just came in."

–b–

It has been mentioned before that after the parties rejoined in August 1968, they were together until July 1973, when they separated for the second and final time, Record 16a, and that although the husband's complaint for divorce was filed in December 1966, no action was taken on it until November 1974, Record 1a. From this chronology it will be observed that the husband by his own complaint was obliged to prove indignities before February 1962. His testimony, however, was diffuse and generally not specifically concerned with that period.

The majority's comment that the wife's attorney did not object to the admission of testimony pertaining to events after February 1962 is beside the point, which is that whether objected to or not the husband's testimony had to prove that indignities had occurred before February 1962.

It is of course true, as the majority also comments, that evidence of what occurred after February 1962 might be relevant as shedding some light on what probably occurred before then. *Martin v. Martin*, 157 Pa.Super. 538, 43 A.2d 637 (1945). This principle, however, does not help but rather hurts the husband's case; for what occurred after February 1962 was almost certainly some sort of reconciliation. To be sure, the husband denied that his wife's return in August 1968 was a reconciliation; however, I have already discussed my inability to accept his explanation of her return. In addition, the husband acknowledged having had sexual intercourse with his wife after her return; he described the intercourse as rare. ("Every, I would say about three or four times to my knowledge," Record 61a), but given the quality of his other testimony, one may regard his description with skepticism.[2]

**2.** The wife's testimony was:

> Well, maybe this week we would have it [sexual intercourse] two or three times and then maybe for two or three weeks we wouldn't have it anymore. Then maybe back two or three times a week again. This is the way it went.
>
> Record 73a.

In any event, so much is clear: the husband filed his complaint in 1966 but did nothing about it; two years later (in 1968) his wife returned; at least a certain number of times after her return he had intercourse with her; and for six years after her return he did nothing about his complaint. The conclusion strongly suggested by these actions is that whatever occurred before 1962, it was not nearly so bad as the husband now claims.

—c—

To conduct a "de novo" review implies the attempt to decide what really happened. My own findings are as follows: The husband is under court order to support his wife and daughter. He has decided to press his complaint because he wants to stop supporting his wife and marry another woman. It is understandable that he should feel this way, for his marriage long ago ceased being a loving relationship. That, however, is at least as much his fault as his wife's.

I arrived at these findings from an examination of the husband's testimony alone. When I also consider the wife's testimony I am the more persuaded. Granted that the wife was not always responsive, and was often imprecise, especially on dates, even so her account of the marital difficulties was far more detailed, and in my opinion makes much more sense, than her husband's. I do not elaborate upon this statement simply because, given the weaknesses in the husband's own testimony, elaboration seems unnecessary.

3: *The Appropriate Remedy*

I rather suspect that by this time (if not much earlier) a good many readers will have asked: "Why so much fuss? He admits the marriage has long ceased to be a loving relationship. Why does he go on and on, and on, arguing that it should not be dissolved?"

Perhaps the decisive fact *should* be that the marriage has long ceased to be a loving relationship; but it is not. Under our law the husband is not entitled to a divorce unless he is

innocent and injured and has proved that his wife has committed indignities. *See generally Steinke v. Steinke*, 238 Pa.Super. 74, 83, 357 A.2d 674, 678 (1976) (concurring opinion). Our responsibility is to enforce this law, for like it or not, it is at least more or less internally consistent, and if we ignore one of its requirements while recognizing another, we are likely to produce both confusion and injustice—results not to be forgiven because produced with the best of intentions. *See Hellman v. Hellman*, 246 Pa.Super. 536, 546, 371 A.2d 964, 969 (1977) (dissenting opinion).

I readily admit that probably in many cases the law's requirements are avoided, or evaded: the husband agrees to support his wife, and she in return agrees to stay away while he testifies that she committed indignities. *See generally Lurie v. Lurie*, 246 Pa.Super. 307, 316, 370 A.2d 739, 743 (1976) (concurring opinion). Here, however, there has been no such agreement; the husband wants to stop supporting his wife, and she is fighting back. It does not appear to me unreasonable of her to fight back: she is 45 years old, Record 67a; and although (as on so much else) the record is vague, there is testimony from which one could find that she has not been well for a number of years, Record 65a–66a, 72a, 110a. Therefore, to award the husband a divorce despite the inadequacy of his proof, and simply because the marriage has long ceased to be a loving relationship is, in my opinion, to do the wife a considerable injustice.

I recognize that this conclusion cannot end our consideration. The question remains, How should the case be decided?

Until now the answer given this question has been to deny the husband a divorce. *See, e. g., Rankin v. Rankin*, 181 Pa.Super. 414, 124 A.2d 639 (1956) (master recommends divorce; lower court dismisses exceptions to master's report and enters decree of divorce; this court rejects master's findings, reverses lower court's decree, and dismisses complaint). I do not, however, regard this as a sound solution, and I am therefore unwilling to say that we should dismiss the husband's complaint here.

To dismiss the complaint implies far more confidence in the accuracy of "de novo" review than I consider justified. It seems to me that we should adopt the following procedure.

We should in every case engage in two steps. First, we should give the master's findings the "fullest consideration," and second, we should review the record "de novo" (not taking "de novo" too literally). *Coxe v. Coxe, supra* (my dissenting opinion). If the master's findings are persuasive, and our own "de novo" findings agree, we should do as the master has recommended. (Note: I do not say, do as the lower court has done, for the lower court is in no better a position than we, and its order is therefore entitled to no deference. *See Coxe v. Coxe, supra.*) If the master's findings are not persuasive, but nevertheless his result agrees with the result indicated by our own "de novo" findings, again we should do as the master has recommended. If, as here, however, the master's findings are not persuasive, and his result differs with the result indicated by our own "de novo" findings, we should remand for further proceedings. By remanding we should discharge our obligation to conduct "de novo" review, while recognizing our limitations. In the present case, for example, I acknowledge that the master has seen the witnesses and I have not. Perhaps, therefore, after all the master and the lower court are right, and the husband is entitled to a divorce. Nevertheless, the fact remains that the master's report should *show* that the husband is entitled to a divorce.

A report that does now show that its conclusion is sound should never be upheld. It is no more than an arbitrary statement, and the law must never be arbitrary. *Cf. Commonwealth v. Riggins*, 232 Pa.Super. 32, 40, 332 A.2d 521, 525 (1974) (dissenting opinion), *allocatur granted*, August 15, 1975, *reversed*, 474 Pa. 506, 378 A.2d 1229 (1977). Here the record is notably meagre, and the master's analysis of that record is notably flawed.

In child custody cases we do not hesitate to remand for further hearing with the admonition that the findings must

be explained, that the explanation must be supported by the record, and that if a determination of the child's welfare requires it, further witnesses should be called. *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976); *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 331 A.2d 665 (1974); *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 312 A.2d 58 (1973). The welfare of the parties in a divorce case is also important. As remand may be appropriate in a child custody case, so it may be in a divorce case. Here I think remand is appropriate as the way most likely to recognize the interests of both parties. Our law permits a husband to put his wife out on the street—no matter that she may be sick and unable to support herself, if she was at fault and he was not. So be it; but let the husband prove his case.

The decree of divorce should be vacated and the record remanded for further hearings before the master, and for the submission by the master of a second report.

VAN der VOORT, J., joins in this opinion and files a separate dissenting opinion.

VAN der VOORT, Judge, dissenting:

I join in the Dissenting Opinion of my colleague, Judge SPAETH, except that I would reverse the decree of the court below, refuse the divorce and dismiss the complaint.