## Grill v. Grill

*Vincent V. Makowski,* for plaintiff.
*Jack C. Younkin,* for defendant.

KREHEL, *P.J.,* February 22, 1984—Before the court are defendant's exceptions to master's report. Both parties filed briefs and presented oral arguments on 15 February 1984, all of which have been duly considered.

The issues to be resolved by the court concern (1) the valuation of marital real estate located at 1713

West Independence Street, Shamokin, Pa.; (2) the conditions of the mortgage on said real estate plaintiff is to give defendant; and (3) the division of the marital property.[1]

## I. THE VALUATION OF THE REAL ESTATE

While plaintiff has cited cases to the court standing for the proposition that a reviewing court must accord great weight to the findings of a master on issues of credibility which are necessarily resolved by personal observations,[2] there is also authority indicating that a reviewing court is to make an independent review of the record and is to consider the evidence de novo, pass on its weight and on the credibility of witnesses, and reach an independent conclusion on the merits. Herwig v. Herwig, 279 Pa. Super. 65, 70, 420 A.2d 746, 748 (1980). Applying either standard of review, however, we conclude from our complete review of the testimony presented to the master that his valuation of the real estate in question should not be disturbed.

While defendant's expert witness, Jack Martin, was eminently qualified to testify as to the value of the real estate, we find substantial reasons on the record for discounting his testimony.

While Martin testified that he observed no leaks above the kitchen windows, defendant, himself, admitted their existence, While Martin testified that

---

1. Although raised in the exceptions, plaintiff has consented to the modification of the master's report to provide for the equal division of four burial plots and for the awarding of Prudential Life Insurance of America life insurance policies Nos. D40 470 073 and 25 447 708 to defendant.

2. Weaver v. Weaver, 266 Pa. Super. 115, 403 A.2d 120 (1979); Hargrove v. Hargrove, 252 Pa. Super. 120, 381 A.2d 143 (1977); Dougherty v. Dougherty, 235 Pa. Super. 122, 339 A.2d 81 (1975).

he didn't notice water spot marks on the living room ceiling, defendant, again, admitted their existence. While Martin testified that to the best of his knowledge the outside of the house was in completed form, defendant, to the contrary, testified that there are about five courses of brickwork that have to go on the exterior of the house and that the siding is somewhat incomplete.

The remarks of defendant magnify in significance when we consider that his occupation is that of home improvements.

In other respects, Martin's testimony was less than unequivocal. He testified that to the best of his knowledge the outside of the house was in completed form but retracted even that when shown a picture of the house on cross-examination. He readily conceded that what he identified as a flagstone patio may have been, in fact, made of concrete.

In view of the foregoing, the court concludes that the appraisal done by Mr. Martin and the valuation he gave the property based on that appraisal are highly suspect. It is in that light that we evaluate the testimony of plaintiff which further contradicts the testimony of Mr. Martin.

Plaintiff testified that there are three different shades of aluminum siding on the house. Plaintiff testified that every time the coal barrel is filled the house becomes dusty and dirty. Plaintiff testified that the floor of the cabinet underneath the sink is rotten because of leakage underneath the pipes.[3] Plaintiff testified that there are holes on a couple of

---

3. We note that while defendant testified that the leakage is probably due only to worn out washers, he did not contradict plaintiff's testimony concerning the condition of the cabinet floor.

steps where the banister was removed.[4] Plaintiff testified that the plaster is bad in the stairway and that there are cracks in the ceiling going up the stairway. Plaintiff testified to the poor condition of the windows in the house. Plaintiff testified to the existence of wiring which is either taped or capped in a few areas of the house.[5]

Plaintiff further testified that on the third floor wall plaster is crumbling, the ceilings are not in very good condition, and slates can be seen in several places on the walls and ceilings.[6] Plaintiff additionally testified that there are seven to eight tile blocks missing from the floor of the bathroom off the day care center.[7] Plaintiff also testified that the porch floor boards are rotted or eaten out by termites.[8] Finally, plaintiff testified that the sides of the porch roof are rotted.

Taking into account the contradictions of Mr. Martin's testimony by defendant, himself, and the equivocal nature of some of Mr. Martin's answers, we conclude that the master was entitled to credit

---

4. The court notes that defendant testified that he tore out the stairway and was going to do that next in connection with remodeling the living room. His inconclusive testimony that he "finished that up and . . . wound up with my problems" leaves us hanging and probably the stairway as well.

5. We find some support for plaintiff's testimony in this regard in defendant's testimony that ". . . the wiring that is there is to build on. . .".

6. Mr. Martin testified to such condition in one room of the third floor. In fairness, it is not clear whether his testimony and that of plaintiff are divergent in this regard.

7. Mr. Martin testified that there was some wall work to be done in the bathroom but he did not remember that any tile work had to be done.

8. We note that defendant testified to termite problems at the house although he did not testify as to any damage they may have caused.

and to rely on the foregoing testimony of plaintiff despite her self-interest in the outcome of this issue. While Mr. Martin testified that he took into account what needs to be done to the property in arriving at his valuation, it is clear that he failed to discover much of what needs to be done.

Further, it is clear that the house suffered further setbacks after Martin's November, 1980, evaluation despite what defendant told Martin to the contrary. Defendant admitted that he removed an above-ground swimming pool in 1981. The only issue was the degree of damage this did to the back yard. Defendant admitted that in 1981 he removed two built-in air conditioners from the house. On one occasion, it appears that he made a haphazard attempt to repair the resulting hole in the wall and on the other occasion, he made no repair effort whatsoever.

In addition to finding a substantial basis for crediting plaintiff's testimony concerning the condition of the house, we find support in the record for her valuation of $35,000 placed on the house based upon its physical condition. Floyd B. Carey, who testified as an expert witness on behalf of plaintiff,[9] placed a valuation of $30,000 on the property.[10] Finally and most telling in our estimation is Mr. Mar-

9. The court finds that the master acted properly when he overruled defendant's objection to qualifying Carey as an expert. Mr. Carey testified to having done appraisal work over a period of about 27 years, to having been in the construction business in the mid-sixties, and to having received some course work in real estate appraisals. He made an inspection of the property and compared it with other properties which had been sold. See generally 15 P.L.E. §402 and 403.

10. While defendant tells us that the master disregarded plaintiff's expert because of the lack of foundation for his opinion, we think it more likely that because the master accepted plaintiff's valuation, which was higher than that of her expert, he saw no need to discuss her expert's opinion at length.

tin's acknowledgment that other properties of the same age had been selling for from $29,000 to $34,000.

## II. THE MORTGAGE

The master awarded the aforesaid property to plaintiff subject to a mortgage in favor of defendant in the amount of $5,000 without interest payable upon the sale of the property "whenever that might be." Defendant has argued that the property should be sold upon plaintiff's death, remarriage, cohabitation on the premises with a man, or when the parties' youngest child reaches age 18, whichever occurs first, and that the mortgage should have an annual interest rate of 13 percent.

Plaintiff has agreed that the mortgage principal should be paid in full upon her sale of the property, remarriage, cohabitation on the premises with a man, or death, but has argued that paying off the mortgage in five years when the youngest child reaches age 18 or at 13 percent interest would create an intolerable economic burden.

The court is of the opinion that the mortgage should be subject to 13 percent interest. It is apparent that while the master concluded that plaintiff needed the marital home for herself and the dependent children of the marriage, over whom she had custody, and for her business, he also concluded that in the overall property division, defendant was entitled to a distributive share of the value of that property.

The mortgage provided a device whereby both purposes could be served albeit, in defendant's case, delayed.

We find the rationale of Daly v. Daly, 179 N.J. Super. 344, 432 A.2d 113 (1981), cited to us by de-

fendant, persuasive. It seems only fair that defendant's delayed realization of his distributive share should be compensated by a reasonable rate of interest. We have neither been cited to nor have we discovered any Pennsylvania cases to the contrary.

We do not accept, however, defendant's additional argument that the property should be sold in order to pay the mortgage, at the latest, upon the parties' youngest child reaching age 18.

We note that the master awarded defendant certain real property unencumbered, forever, and with no further distributive share for plaintiff. It is clear that the master, correspondingly, intended that plaintiff should have the marital property awarded to her, although encumbered, as long as she desired.

While we think it is fair for defendant to have a mortgage with interest on the property, we believe that the possibility of plaintiff's having to give up that property to pay mortgage should be kept to a minimum. Just as defendant will be allowed to keep the marital property he was awarded forever, so should plaintiff have that same opportunity.

We note that both parties have been awarded marital property which they use for both business and residence purposes. Both parties are approximately the same age. Accordingly, we assume that their property needs for both business and domicile will be parallel over the forthcoming years.

Based upon our review of the record, we have calculated plaintiff's annual income before income taxes to be $10,075.[11] This would translate into approximately $840 per month.

---

11. Plaintiff testified that in the year prior to the hearing, her after-expense income from the operation of her day care center was $6,695. She further testified that she was receiving

We have considered two mortgage-payment plans for plaintiff, five years and ten years. We have determined that the monthly payments over five years would be approximately $113 and over ten years would be approximately $75.[12] While we believe that plaintiff could accommodate either schedule, we also believe either schedule is fair to defendant. Accordingly, plaintiff shall be allowed to choose the payment schedule of her preference.

Further, defendant will not be allowed to foreclose on the mortgage and have the property sold to complete payment of the mortgage if plaintiff fails to do so until after the full payment period selected by defendant has elapsed. In the event plaintiff does have to foreclose he shall be entitled to receive interest on any remaining unpaid balance, including principal and interest, at the annual rate of 13 percent to be computed from the time the last payment was due until the time he actually receives his remaining distributive share from the sale of the house.

## III. DIVISION OF THE MARITAL PROPERTY

Defendant has excepted to the master's awarding 56 percent of the marital property to plaintiff. Defendant has argued that in this case there should have been an even division of the marital property. With 20/20 hindsight, he seeks a 50/50 split.

While we agree that equitable distribution does not preclude an even distribution, we must also rec-

---

$25 per week room and board from her son, Thomas. Finally, she testified that she was receiving $40 per week child support from defendant.

12. See *Simple Interest Amortization Tables,* pp. 518 & 520 (Carleton Financial Computations, Incorporated, 1971) of which judicial notice is hereby taken.

ognize that the essence of the concept of an equitable distribution is a "just division" based upon all relevent factors which may also encompass awarding "the lion's share" of the property to one spouse. See Platek v. Platek, 309 Pa. Super. 16, 454 A.2d 1059, 1063 (1982). Based upon our review of the record, we have concluded that the master's distribution was equitable in the circumstances of this case. A "proportionate" distribution does not imply two "equal" portions.

It appears that the master's distribution was in large measure based upon practicality and not on the basis of monetary value alone. Further, the property division appears to comport with that which the parties had de facto affected at the time of their separation.

The master awarded the marital residence to plaintiff. This had already been abandoned by defendant. It had remained the residence of plaintiff and parties' minor dependent children. It was also plaintiff's place of business.

The master awarded the remaining marital real estate to defendant. This included an apartment house at 1000 East Clay Street, Shamokin, Pa., where defendant had taken up residence after the separation. This also included a warehouse where defendant stored tools and materials necessary for his home improvement business.

The master awarded to plaintiff the 1975 Volkswagen Rabbit which was titled to and used by her. The master awarded to defendant the 1975 Ford pick-up truck which was titled to and used by him presumably for business purposes in addition to personal use.

Similarly, the master left the household furnishings as they were. This too appears to have been an

eminently practical and equitable result inasmuch as it appears that defendant had already helped himself to that which he felt he needed.

While we agree with defendant to an extent that an evaluation of the factors set forth in section 401(d) of the Divorce Code, 23 P.S. §101 et seq., leads to a conclusion that the distribution of property in this case should be fairly even, we do not conclude that the master's distribution produced an inequitable result. Presumably recognizing that the utilitarian division of the property he had made produced a disproportionate dollar value of property in plaintiff's hands, the master attached the mortgage to the marital domicile. We have decided to add interest to that mortgage in order to assure that defendant's distributive share of the marital domicile is not devalued over the course of plaintiff's payments.

Turning to the specific considerations of section 401(d), it appears that items (1), (2), (9) and (10) militate in favor of a reasonable equal division of the marital property. We have a 25 year marriage with no prior marriage for either party. Both parties have been able to maintain a standard of living commensurate with that established during their marriage. While defendant has taken up residence in their apartment house as opposed to their more spacious marital domicile, it appears that his living conditions are suitable for an individual living alone.

The parties have chosen not to delve into the considerations set forth in sections 401(d)(5) & (8).

With respect to section 401(d)(4) & (7), defendant had made a great deal of his construction of the day care center for plaintiff. While certainly credit should be given where due, we note that the income plaintiff receives from the day care center comprises

nearly 70 percent of her annual income. Had defendant not constructed that day care center, he might well have been faced with a much more disproportionate property division than that about which he is now complaining.

With respect to section 401(d)(3) & (6), defendant takes great offense to the master's analysis of the parties' relative incomes, both present and potential. While plaintiff's income from the day care center did increase substantially over the few years prior to the hearing, it appears that this is attributable largely to the fact that it was a new, as well as successful enterprise. It appears that the day care center may be nearing its maximum capacity at plaintiff's residence. It is unduly speculative for our purposes here to assume that plaintiff will be able to establish larger facilities or that she will continue to enjoy an ever-expanding-growing in age rather than in size-clientele.

On the other hand, defendant makes much ado about his financial downturn. Defendant attributes his downfall to the poor economy. We can much more assuredly predict that the economy, being historically cyclical in nature, will return to an upswing taking defendant back up along with it than we can that plaintiff's business will continue to steadily grow.

Further, while the master may have been guilty of overstatement when he attributed defendant's lack of income to his failure to devote full time to his work, defendant should have recognized that with a general downturn in his line of business, he could not rest on his laurels and rely on the phone to ring as he did in the past. We cannot fault him if he errs on the side of caution.

In view of the foregoing, as the final decree in this matter, we enter the following

## ORDER

And now, this February 22, 1984, it is hereby ordered, adjudged, and decreed that the master's report herein be modified as follows:

(1) That each party be awarded two of their family burial plots;

(2) That defendant be awarded life insurance policies Nos. D40 470 073 and 25 447 708 issued by Prudential Life Insurance Company of America;

(3) That plaintiff grant to defendant a mortgage in the amount of $5,000 on the premises located at 1713 West Independence Street, Shamokin, Pa., payable with interest at an annual rate of 13 percent;

(4) That the aforesaid mortgage shall be paid, at plaintiff's option, over a five year period or a ten year period;

(5) That in the event plaintiff sells the premises, remarries, enters into cohabitation on the premises with a man, or dies, the outstanding balance, if any, due on the mortgage at that time shall be immediately paid; and

(6) That in the event plaintiff fails to complete payment of the mortgage when due, defendant shall be entitled to foreclose on the mortgage and have the property sold, in which event defendant shall be entitled to receive from the proceeds of the sale, the balance due, including principal and interest, with 13 percent annual interest thereon to be computed from the time when the payment of the mortgage should have been completed until the time of actual payment.

It is further ordered, adjudged, and decreed that, except as provided hereinabove, defendant's exceptions be denied and the master's report be approved.

Finally, pursuant to the request of the parties made at the oral argument in this matter, it is hereby ordered and decreed that Donna M. Grill and Martin D. Grill be divorced from the bonds of matrimony.